[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
[1] Neither Defendant Timothy H. Brown nor American Suzuki Motor Corporation and Suzuki Motor Corporation is a party to this appeal.
 DECISION AND JUDGMENT ENTRY
{¶ 1} This is a consolidated appeal from a Meigs County Common Pleas Court judgment following a jury trial in a personal injury action arising out of single-vehicle motorcycle accident. The jury returned verdicts in Crystal Wright's and her minor children's (Kristen Jacquard and Amber Jacquard) favor regarding: (1) their negligence claims against Ackers, Inc. dba Ask Powersports,[3] Mary Jo Ackers, Steve Wiseman, and Todd Coleman, the motorcycle dealership and the sellers of the motorcycle (the Ackers defendants); (2) their product liability claim against American Suzuki Motor Corporation and Suzuki Motor Corporation, the manufacturers of the motorcycle (the Suzuki defendants); and (3) their negligence claim against Timothy H. Brown, the motorcycle driver. The jury awarded Wright $5,278,703 in compensatory damages and $1 million in punitive damages. the jury declined to award monetary damages for Wright's children's loss of consortium claims and declined to award them punitive damages. The jury determined that Wright was entitled to attorney fees, and after a hearing, the court awarded Wright $233,558 in attorney fees. The court denied Wright's claim for prejudgment interest.
 {¶ 2} In Case No. 03CA2, the Ackers defendants[4] raise the following assignments of error:
FIRST ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANTS WHEN IT FAILED TO EXCLUDE EXPERT TESTIMONY WHICH HAD NOT BEEN SUPPLEMENTED AS REQUIRED BY OHIO RULE OF CIVIL PROCEDURE 26(E)."
SECOND ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANTS WHEN IT FAILED TO DIRECT A VERDICT IN FAVOR OF ALL DEFENDANTS AT THE CLOSE OF PLAINTIFFS' CASE IN CHIEF."
THIRD ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANTS WHEN IT FAILED TO DIRECT A VERDICT IN FAVOR OF ALL DEFENDANT-APPELLANTS ON THE ISSUE OF PUNITIVE DAMAGES AT THE CLOSE OF PLAINTIFF'S OPENING STATEMENT."
FOURTH ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANTS WHEN IT FAILED TO DIRECT A VERDICT AS TO DEFENDANT'S [SIC] ACKERS, INC., ASK POWERSPORTS, AND STEVE WISEMAN ON THE ISSUE OF PUNITIVE DAMAGES AT THE CLOSE OF PLAINTIFFS' CASE IN CHIEF."
FIFTH ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANTS WHEN IT FAILED TO GRANT DEFENDANT-APPELLANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND, IN THE ALTERNATIVE, A NEW TRIAL, BASED ON THE MULTIPLE ERRORS OF LAW COMMITTED BY THE TRIAL COURT THROUGHOUT THESE PROCEEDINGS AND GIVEN THE FACT THAT THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
SIXTH ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED IN AWARDING ATTORNEY FEES GIVEN THE ABSENCE OF A BASIS FOR PUNITIVE DAMAGES."
SEVENTH ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANTS WHEN IT STRUCK THE AFFIDAVIT OF PAUL ACKERS."
 {¶ 3} In Case No. 03CA3, Crystal Wright, plaintiff below, raises the following assignments of error:
FIRST ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR DIRECTED VERDICT MADE DURING TRIAL IN FAVOR OF DEFENDANTS MARY JO ACKERS AND TODD COLEMAN ON THE CLAIM FOR PUNITIVE DAMAGES."
SECOND ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED IN DENYING PLAINTIFF'S MOTION FOR PREJUDGMENT INTEREST."
 {¶ 4} In Case No. 03CA4, Larry Wright, as guardian for Kristen Jacquard and Amber Jacquard, plaintiffs below, raises the following assignments of error:
FIRST ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED IN ENTERING JUDGMENT IN FAVOR OF LARRY WRIGHT, AS GUARDIAN OF KRISTEN JACQUARD AND AMBER JACQUARD, AS AGAINST ALL DEFENDANTS, BUT AWARDING COMPENSATORY DAMAGES OF $0.00."
SECOND ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED IN ENTERING JUDGMENT IN FAVOR OF LARRY WRIGHT, AS GUARDIAN OF KRISTEN JACQUARD AND AMBER JACQUARD, AS AGAINST DEFENDANTS ACKERS, INC. AND STEVEN WISEMAN ON THEIR CLAIM FOR PUNITIVE DAMAGES, BUT AWARDING $0.00."
THIRD ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR DIRECTED VERDICT MADE DURING TRIAL IN FAVOR OF DEFENDANTS MARY JO ACKERS AND TODD COLEMAN ON THE CLAIM FOR PUNITIVE DAMAGES."
 I BACKGROUND {¶ 5} On August 10, 2000, Crystal Wright suffered paralyzing injuries in a one-vehicle motorcycle accident while a passenger on the Suzuki Katana motorcycle that her boyfriend, Brown, drove. Brown purchased the motorcycle that day from the Ackers dealership in Lancaster. At the time of Brown's purchase, the motorcycle undisputably had a manufacturing defect: the front tire leaked air due to a defective rim.
 {¶ 6} Wright subsequently filed a complaint against: (1) the Suzuki defendants; (2) the Ackers defendants; and (3) Brown. She alleged negligence and strict liability claims and sought punitive damages. The complaint also contained loss of consortium claims on behalf of Wright's minor children.
 {¶ 7} At trial, the crucial issue was whether the defective tire rim proximately caused the accident and Wright's resulting injuries. Before trial, Wright's primary expert, Lawrence Gregory DuBois, was unable to opine within a reasonable degree of scientific certainty that the leaking tire rim proximately caused the accident. Instead, he opined that the leaking tire rim as a proximate cause of the accident was consistent with his investigation. DuBois opined: "It is my professional opinion to a reasonable degree of scientific probability that the conclusion that the loss of air pressure from the manufacturing defect was a proximate cause of the accident is consistent with the available information and physical evidence." Because he could not express his opinion within a reasonable degree of scientific certainty, the Ackers defendants requested the trial court to exclude his opinion. The trial court subsequently concluded that for DuBois's opinion to be admissible, he must express his opinion within a reasonable degree of scientific certainty.
 {¶ 8} Beginning on February 10, 2002, and continuing through March 1, 2002, the court held a jury trial. After Wright's counsel completed opening statement, the Ackers defendants moved for a directed verdict regarding her punitive damage claim. They argued that Wright did not mention in opening statement any type of conduct to establish her entitlement to punitive damages. The court took the matter under advisement.
 {¶ 9} At trial, Wright's first witness, former ASK employee Joshua Eck, testified that in June of 2000, he performed the set-up for the Suzuki motorcycle that Brown purchased. Sometime after setting it up, Eck noticed the flat front tire. He took the motorcycle inside to check for a leak. Unable to find a leak, he filled the tire with air and put it back on display. He did not notify anyone of the apparent leak. Later, Eck again discovered the tire flat. Eck pointed this out to the set-up manager, Steve Wiseman, and Wiseman stated that he also had noticed the flat tire. Eck again tested the tire to attempt to find the source of the leak but still could not determine the source. Eventually, Eck learned that the tire rim was the source of the leak. Eck advised Wiseman that the rim was "bad" because air seemed to be coming through the rim. Wiseman said that he would order a new rim for the wheel. Eck put the wheel back on the motorcycle, but does not recall whether anyone instructed him to do so. Eck stated that he did not put the bike on the sales floor, but at some point, Wiseman told Eck to get the bike ready for sale.
 {¶ 10} Pursuant to Wiseman's request, Eck performed the pre-delivery inspection before Brown took possession. Eck stated that the pre-delivery process involves informing the customer about the motorcycle and that the entire process took about five minutes. He checked the tire pressure and it was 33 pounds per square inch (psi). Eck did not road-test the motorcycle, even though the certification form stated that he did. Furthermore, neither Eck nor anyone at ASK repaired or replaced the defective wheel rim before delivery to Brown.
 {¶ 11} Eck testified that he did not believe the dealership should have allowed Brown to take the motorcycle with the defective tire rim. Eck stated that he believed the motorcycle with its leaking front tire to be defective and that he and Wiseman were upset that the bike was leaving without fixing the front tire leak. Eck thought the bike was dangerous to ride and that the dealership should not have sold it. Eck testified that when Brown took the bike, he knew "there was a high probability and almost a certainty that [the] tire was going to leak at some time while that bike was in [Brown's] possession."
 {¶ 12} ASK salesman Todd Coleman stated that he met with Brown on August 10, 2000 when Brown came to take delivery of the motorcycle. Coleman stated that as of that date, no one had indicated to him that the bike was defective and should not be sold. Coleman stated that he overheard a conversation between Wiseman and Brown. He heard Wiseman inform Brown that the tire was slowly leaking air and that Wiseman did not want Brown to drive it. Wiseman advised Brown that if possible, he should not take the bike home that day but return once the problem was fixed. According to what Coleman overheard, Brown stated that he could not come back at a later date because he was two hours away from home and he did not have a ride. Wiseman advised Brown that he would rather Brown not take the bike home that day.
 {¶ 13} ASK dealership owner Paul Ackers testified that the store managers were instructed that if a bike has a defect that affects safety, they should note it on the computer. He stated that this instruction would prevent the sale and delivery of the motorcycle. Ackers explained that the dealership does not place any physical markings, such as a tag, on the motorcycles that should not be sold. He agreed that the dealership released the bike to Brown in a defective condition.
 {¶ 14} Crystal Wright testified that when she was riding on the motorcycle with Brown, she did not notice anything wrong with it. She stated that just before the crash, she did not feel like Brown had hit anything to cause the crash.
 {¶ 15} ASK employee David Baker testified that he showed Brown the motorcycle and they both noticed that the tire was low. Baker stated that he told Wiseman about the flat tire. Baker testified that he promised Brown that the motorcycle would be fixed and safe before Brown took delivery.
 {¶ 16} After Baker's testimony, the court allowed the Ackers defendants to argue their directed verdict motion. They asserted that during her opening statement, Wright did not allege that the Ackers defendants exhibited a conscious disregard for the rights and safety of others. Wright contended, however, that counsel alleged that the Ackers defendants made a "knowing decision," and that no requirement exists that counsel use the exact words "conscious disregard." The trial court again deferred ruling upon the motion.
 {¶ 17} The testimony continued with ASK set up manager Steve Wiseman. He testified that he met Brown when Brown picked up the motorcycle. Wiseman stated that on that date, he also met with Mary Jo Ackers because he was concerned about the leaking front wheel on the motorcycle. He stated that he had a serious concern, but Mrs. Ackers did not give him any specific instructions. Wiseman explained that Coleman also was present for the brief meeting with Mrs. Ackers and that Wiseman told Coleman that he did not want the motorcycle to leave the property and that he considered it to be a potential danger. Wiseman testified that he wanted the rim replaced before Brown took delivery, but Mrs. Ackers told Wiseman that Brown was going to take the motorcycle. Wiseman explained that Mrs. Ackers indicated that the motorcycle would be leaving the dealership because Brown needed to take it with him that day. Wiseman stated that he was "very upset" that the motorcycle was leaving and he "went through the roof."
 {¶ 18} Wiseman stated that he spoke with Brown and advised Brown that he preferred that Brown leave the motorcycle at the dealership until the rim could be replaced. Wiseman told Brown that the leak on the motorcycle wheel was a slow leak and that he considered the motorcycle potentially dangerous.
 {¶ 19} Wiseman testified that he knew that low tire pressure can affect handling, which could result in injury or death, as indicated in the Suzuki Owner's Manual. Wiseman admitted that he did not tell Brown that the motorcycle should not leave the property and did not tell Brown that he had advised management that it should not leave the property.
 {¶ 20} Wiseman explained that the dealership does not have a system that "red-flags" motorcycles that should not be sold,[5] but has a system to indicate whether a motorcycle needs repair. He stated that the system enables an employee to put a hold on the motorcycle. Wiseman testified that although he did not put a hold on the motorcycle sold to Brown, he put a work order in the system.
 {¶ 21} Brown testified that when he arrived to pick up the motorcycle, Coleman told him that there was a little problem. Coleman advised Brown that the bike had a small leak, but it would be okay to take it home. Brown's boss, Mark Wheaton, had given Brown a ride to the dealership and waited to make sure that Brown would be able to ride the motorcycle home. Before Wheaton left, Wheaton asked Coleman whether Brown would be able to ride the motorcycle home and Coleman said yes. Wheaton told Brown that if Brown needed a ride home, Wheaton would be in Lancaster and Brown could call him. Brown thus explained that he did not absolutely need the motorcycle to return home because Wheaton could have provided him with a ride.
 {¶ 22} Brown stated that Wiseman told him that the motorcycle had a slow leak that would cause the wheel to be flat in about two weeks. Wiseman told Brown to bring the motorcycle back to the dealership the next day for the repair.
 {¶ 23} Brown explained that Coleman knew that Brown would have a passenger riding on the motorcycle because Coleman helped Brown pick out a second helmet. Brown also stated that he told Coleman that when he returned home with the motorcycle, he was going to ride it.
 {¶ 24} Brown stated that before he left, Wiseman gave him a tire gauge. Brown explained:
"While we were in the finance office, when he was talking about the tire pressure in the front tire. I said, `Well, if it's dangerous, I don't want it.' I said, "Can you give me something else to ride'? He said, `No, we can't do that because of insurance reasons. I can't let you have another bike.' I said, `Well, are there any more Katanas anywhere, at any other dealerships?' He said, `No, we can't swap stuff out from store to store, even if there was one.' He said, `Look, if you're that damn worried about it, here's a tire pressure gauge. Before you come back in the morning, check it.' I said `Okay.'"
 {¶ 25} Brown stated that the crash occurred when he started traveling into a curve. He explained that he felt the bike wobble and he lost control. He stated that if he knew what Wiseman had told Mrs. Ackers, he would not have left the dealership with the motorcycle.
 {¶ 26} Mark Wheaton testified that when the ASK salesman told Brown that the motorcycle had a defective front wheel and would be ready the next day, Brown was disappointed. Wheaton stated that the salesman then changed his attitude, indicating that it would be okay to take the bike that day. Wheaton stated that when he heard about the accident the next day, the first thing he thought about was the wheel.
 {¶ 27} Ohio State Highway Patrol Trooper Karen Lambert-Heater investigated the accident. She explained that Brown stated in the accident report that he hit a small animal, but she discovered no evidence that Brown hit a small animal. She stated that Brown later contacted the Ohio State Highway Patrol and requested to change his report that he hit a small animal. The trooper observed that the skid marks left on the pavement appeared to have been caused by a locked up tire. She concluded that unsafe speed caused the accident.
 {¶ 28} The testimony then turned to whether the defective rim proximately caused the accident. To show that it did, Wright's counsel asked DuBois, her expert, the following hypothetical question:
"I want you to assume that Mr. Brown, on the evening of August 10, 2000, at approximately 10:30 p.m., was operating his motorcycle in an easterly direction on State Route 325, and that when entering a curve to the right, he began to lean the motorcycle into the turn, and at that time tapped the front brake, and the front of the bike wobbled, and the handlebars went back and fourth, and he was not able to control the motorcycle, and he ended up driving it into the ditch on the left-hand side of the road and had the wreck that is the issue in this case.
I want you to further assume that the front wheel had a manufacturing porosity defect which permitted the loss of air pressure.
Do you have an opinion, based upon your training and experience and research and study in this area, to a reasonable degree of scientific probability, as to whether the manufacturing defect and the loss of air therefrom was a proximate cause of the wreck on August 10, 2000?"
 {¶ 29} Defense counsel objected and argued that before trial, DuBois specifically testified in his deposition that he could not form an opinion within a reasonable degree of scientific certainty as to the proximate cause of Brown's motorcycle accident. The Ackers defendants asserted that because Wright failed to disclose DuBois's apparently newly-formed opinion before trial, the trial court must exclude it under Civ.R. 26(E).
 {¶ 30} The court then questioned DuBois as to why his opinion now differed. DuBois explained:
"I'm being allowed to assume that Mr. Brown had a wobble in his front wheel, which I don't know. If I can assume that, I can draw this opinion. But at the time I was giving the deposition, I was never asked to assume to be the fact or assume to be true that his front wheel wobbled. And the only way I can reach that opinion is being allowed to make that assumption as fact."
 {¶ 31} The court then allowed DuBois to answer the hypothetical question to opine that within a reasonable degree of scientific certainty, and assuming that a wobble occurred, low tire pressure was a proximate cause of the accident. DuBois further explained that ordinarily, no physical evidence would exist to indicate whether a front motorcycle wheel tire wobbled.
 {¶ 32} On cross-examination, the Ackers defendants questioned DuBois regarding his assumption that a wobble occurred: "That's not a fact that you, through your investigation, could testify occurred to a reasonable scientific probability; could you?" DuBois answered: "[T]he literature is quite clear on the subject that reduced air pressure on motorcycle front tires can cause instability and control problems, including wobble." Defense counsel also asked DuBois:
"Based upon your personal investigation of this accident, things that you are able to see at the site, physical evidence on the roadway, off the roadway, physical evidence of the motorcycle, physical evidence of the tire and wheel assembly, the testing that you did * * * over a period of many months, you didn't find things that would allow you to express a scientific opinion to a reasonable degree of scientific probability that low tire pressure was proximately related to causing this accident; were you?"
 {¶ 33} DuBois answered, "No."[6]
 {¶ 34} Jack Holland, a traffic accident consultant, testified that he found five sources that refer to air pressure and its adverse impact on motorcycle stability. Although the court did not allow him to opine whether the defect and low air pressure proximately caused the accident, it did permit him to state that he thought that low air pressure was a factor in causing the accident.
 {¶ 35} Jon Castin testified that he has approximately sixteen years of experience as a motorcycle set up manager and that he services motorcycles. He stated that he would be alarmed if he noticed a brand new motorcycle with a flat tire two or three times within a one to three week period. He testified that he would not let a customer take such a bike because it would be "dangerous to their life." Castin stated that he would not release a motorcycle knowing that it had a defective leaking front rim.
 {¶ 36} Castin testified that low air pressure will cause a wobble. Castin explained that to make sure that a defective motorcycle does not leave a dealership, the dealership can "tag it, and write on there that it's dangerous, it shouldn't be rode, or you can take the tire clear off of it, and nobody's riding it."
 {¶ 37} Mrs. Ackers testified that before the motorcycle was sold to Brown, she knew it had a leaking front rim. She stated that she did not do anything to prevent the sale. Mrs. Ackers testified that the motorcycle "had a tag on it, so they would know it needed to be fixed before it was gone." She does not believe that a leaking front wheel is a safety defect.
 {¶ 38} The court again heard the parties' arguments regarding the Ackers defendants' directed verdict motion. Wright argued that during opening statements, she alleged sufficient facts to support the punitive damages claim: (1) the Ackers defendants knew that the tire had a flat tire and a defective rim; (2) the Ackers defendants knew of the defect at least two days before the sale; (3) Wiseman did not believe the motorcycle was safe; (4) Baker assured Brown the bike would be safe; (5) Wiseman told Brown that the leak was just a small leak; (6) Wiseman was upset about the sale; (7) Wiseman told Mrs. Ackers it should not leave the property; and (8) the Ackers defendants had advance knowledge that the bike was unsafe and dangerous, but they did tell Brown the bike was dangerous.
 {¶ 39} The Ackers defendants contended, however, that the above allegations show nothing more than negligence. The trial court granted the Ackers defendants' directed verdict motion as to Mrs. Ackers and Coleman, but denied it as to the remaining Ackers defendants, Wiseman, and Ackers, Inc. dba ASK Powersports.
 {¶ 40} At the close of Wright's case-in-chief, the Ackers defendants again moved for a directed verdict. This time, they asserted that Wright failed to present sufficient causation evidence to support her claims. The trial court overruled their motion.
 {¶ 41} The defense case centered around establishing that the rate of the air leak was sufficiently slow that the tire could not have lost enough air to cause tire instability problems at the time of Brown's accident and that, consequently, the defective tire rim was not a proximate cause of the accident.
 {¶ 42} Thomas J. Carter, a defense expert, testified that he tested the leak rate of the wheel and his testing showed a static leak rate of 33 psi to 27 ½ psi twenty-four hours later — a change of approximately 5 ½ psi. He opined that at the time of Brown's accident, the tire had lost 3 psi.
 {¶ 43} In contrast to DuBois's testimony, Carter stated that a wobble would leave physical evidence. Defense counsel asked Carter: "So if a witness in this case was asked to assume as a basis for an opinion that there was wobble in the front tire, that would be an incorrect assumption, would it not?" Carter responded, "That's correct. There's no evidence of wobble."
 {¶ 44} Carter agreed that "any reasonably prudent mechanic or setup person in a dealership would know that a front wheel and tire on a motorcycle with a leak could be a danger."
 {¶ 45} ASK office manager Debbie Cassler testified that she heard Wiseman ask Brown to leave the motorcycle at the dealership, and Brown stated that he could not because he did not have a ride home. Cassler heard Wiseman advise Brown that if he would not leave the motorcycle, then he should keep his eye on the wheel and check the pressure. Wiseman told Brown to take it home and then back to the dealership the next day. She did not hear Wiseman state that the motorcycle was dangerous or that it had been red-flagged. Cassler testified that she heard Wiseman state that he would prefer Brown leave the motorcycle and come back the next day, but she did not hear him say that the motorcycle was unsafe and should not leave the property.
 {¶ 46} Doug Brown, a defense expert, opined that low tire pressure did not cause the accident. He stated that he did not believe a wobble occurred. A tire expert, Tony Mills, stated that a wobble can occur and not leave evidence on the tire. Ronald Robbins, an expert, stated that typically a wobble will leave physical evidence, but it is possible that it would not.
 {¶ 47} On March 1, 2002 the jury reached a verdict. Before reading the verdict, the court asked counsel if it should check for inconsistencies. Counsel said to read the verdict first. The jury returned the following verdicts: (1) for Wright and her minor children on the "General Verdict Form Relating to Plaintiffs' Claims Against Defendants Ackers, Inc. dba Ask Powersports, Mary Jo Ackers, Steve Wiseman and Todd Coleman"; (2) for Wright and her minor children on the "General Verdict Form Relating to Plaintiffs' Claims Against Defendant Timothy Brown"; (3) for Wright and her minor children on the "General Verdict Form Relating to Plaintiffs' Claims Against Defendants American Suzuki Motor Corporation and Suzuki Motor Corporation"; (4) for defendants Ackers, Inc. dba Ask Powersports, Mary Jo Ackers, Steven Wiseman, and Todd Coleman on the "General Verdict Form Relating to Cross-Claimant's [Brown's] Claims Against Defendants Ackers, Inc. dba Ask Powersports, Mary Jo Ackers, Steve Wiseman and Todd Coleman";[7] and (5) for defendants American Suzuki Motor Corporation and Suzuki Motor Corporation on the "General Verdict Form Relating to Cross-Claimant's Claims Against Defendants American Suzuki Motor Corporation and Suzuki Motor Corporation." The jury awarded Wright $5,278,703 in compensatory damages, and $1 million in punitive damages. The jury did not, however, award any monetary damages to Wright's minor children for their claims. The jury further determined that Crystal Wright was entitled to attorney fees.
 {¶ 48} On March 12, 2002, the Ackers defendants filed a motion for judgment under Civ.R. 49(B) and Civ.R. 58. They asserted that an irreconcilable conflict exists between the interrogatories and the general verdict. The Ackers defendants noted that the jury found that Brown misused the motorcycle and that his misuse was not foreseeable. They thus contended that if Brown's misuse was unforeseeable, then Wright cannot establish that the Ackers defendants owed her a duty or that the Ackers defendants proximately caused the accident. They argued that the jury's finding that cross-claimant Brown's misuse of the motorcycle in a manner not intended or reasonably foreseeable bars Wright's recovery against the Suzuki and Ackers defendants. The Ackers defendants noted that interrogatory (C) inquired: "did the Suzuki defendants and the Ackers defendants prove by a greater weight of the evidence that cross claimant, Tim Brown misused the motorcycle in a manner which was not intended or reasonably foreseeable?" The eight jurors answered "yes."
 {¶ 49} The instructions on the interrogatory stated that if the jury answered "yes," then it should enter a verdict in favor of Suzuki and Ackers upon Brown's cross-claim. The instruction did not have any reference to any of Wright's claims.
 {¶ 50} The trial court determined that the Ackers defendants waived the claimed conflict between the general verdicts and Interrogatory (C), because they did not raise the alleged conflict before the court discharged the jury. The court noted that after it received the verdict forms and interrogatories, it asked whether counsel desired the court to check for inconsistencies. Counsel for the Ackers defendants opted not to do so. The court then read the verdicts and reviewed the jury's answers to interrogatories. Before the court discharged the jury, the court asked counsel if there were any further matters to discuss. The Ackers defendants did not request further discussion. Thus, the court found the claimed inconsistency waived. The court further noted:
"[T]his is not a case where in-depth analysis of the interrogatories and verdicts was necessary to discover an inconsistency. Rather, defendants should have been prepared to act immediately upon the revelation that Interrogatory (C) was answered `yes.' Counsel for the Suzuki defendants prepared the interrogatories, and all defendants reasonably could have brought the perceived inconsistency to the attention of the Court before discharge of the jury."
 {¶ 51} On April 18, 2002 the Ackers defendants filed a motion for a judgment notwithstanding the verdict and, alternatively, a new trial motion. They argued that the court should have stricken DuBois's testimony regarding low tire pressure and proximate cause because Wright failed to comply with Civ.R. 26(E). They also argued that Wright failed to allege or prove sufficient facts showing a conscious disregard for the rights and safety of others that has a great probability of causing substantial harm to warrant punitive damages. The Ackers defendants asserted that the jury did not intend to award punitive damages to punish them. In support of their argument, they attached Paul Ackers affidavit in which he stated:
"On March 1, 2002, after the jury verdict was announced and the trial was completed, I returned to work at the company's dealership in Lancaster. I was surprised to receive a direct call from the jury foreperson, Christina Wood. She told me that she had called information to obtain the ASK business phone number because she suspected I would have gone back to work and she needed to talk to someone from the defense about the verdict. She was very upset. In our conversation, she told me that the announced verdict to award punitive damages was incorrect. They did not intend to award damages to punish ASK. They had only made a finding for actual damages for the injuries to Crystal Wright. She wanted to make sure the defendants knew that punitive damages were never intended."
 {¶ 52} The Ackers defendants also submitted the juror's (Christina Wood's) unsigned affidavit:
"In the course of deliberations, the jury completed the jury interrogatories that were given to us. In one interrogatory, the jury was asked to state the amount of punitive damages for plaintiff Crystal Wright and in response the dollar figure of $1,000,000.00 [one million dollars] was filled in as an answer. On the other interrogatories which asked what amount of punitive damages should be awarded on other claims, a `0' [zero] was filled in.
The purpose of this affidavit is to advise the Court and others concerned that the one million dollar punitive damages answer was incorrect. It does not reflect the actual verdict of the jurors as it was not what was agreed upon by those jurors. No juror intended to award damages to punish or for malicious conduct. Our only finding was to award compensatory damages for the injury claims of Crystal Wright. The interrogatory answer awarding punitive damages does not reflect our true verdict. There was to have been no award for punitive damages to any plaintiff.
These circumstances did not become apparent until after we were released from jury service. After court, when questions began to be asked about what conduct justified punitive damages, I realized the interrogatory answer did not reflect the actual decision of the jury."
 {¶ 53} On May 31, 2002, Wright filed a memorandum contra and disputed the Ackers defendants' argument that they are entitled to judgment notwithstanding the verdict or a new trial. Wright contended that prior to trial, the Ackers defendants knew the substance of DuBois's testimony and had ample opportunity to cross-examine him at trial regarding his answer to the hypothetical. She argued that she advised the Ackers defendants that she would overcome DuBois opinion that low tire pressure as a proximate cause of the accident was consistent with his investigation by using a hypothetical.[8] Wright also filed a motion to strike Mr. Ackers' and Juror Wood's affidavits.
 {¶ 54} On January 31, 2002, the trial court overruled the Ackers defendants' JNOV motion and alternative new trial motion. The court found that it properly admitted DuBois's testimony, was not a surprise to defendants, and did not violate Civ.R. 26(E). The court determined that DuBois's testimony supports the jury's conclusion that the wheel defect was a proximate cause of the accident. The court also disagreed with the Ackers defendants that the jury's proximate cause and punitive damages findings are against the manifest weight of the evidence. Thus, the court discerned no basis for granting a new trial. Additionally, the court struck Mr. Ackers' and Juror Woods' affidavits.
 {¶ 55} On April 3, 2002, Wright filed a motion for prejudgment interest. On January 31, 2003, the trial court: (1) denied Wright's motion for prejudgment interest; and (2) awarded Wright $233,558 in attorney fees.
 {¶ 56} All parties filed timely notices of appeal.
 II CASE NO. 03CA2 THE ACKERS DEFENDANTS' APPEAL[9] {¶ 57} The Ackers defendants' first assignment of error contends that the trial court abused its discretion by allowing DuBois to testify when Wright failed to supplement his testimony under Civ.R. 26. The Ackers defendants' second, third, and fourth assignments of error concern the trial court's decision regarding their directed verdict motions made at the close of Wright's opening statement and at the close of her case-in-chief. We summarize their assignments of error as follows: (1) whether the trial court erred by failing to direct a verdict in Ackers, Inc. dba ASK Powersports'[10] (Ackers, Inc.) favor regarding punitive damages at the close of Wright's opening statement when Wright failed to allege facts in the complaint or during her opening statement to support a finding that Ackers, Inc.'s act or failure to act had a great probability of causing substantial harm; (2) whether the trial court erred by failing to direct a verdict in the Ackers defendants' favor at the close of Wright's case when Wright failed to present sufficient evidence of proximate cause; (3) whether the court erred by failing to direct a verdict in Ackers, Inc.'s favor regarding Wright's punitive damage claim at the close of Wright's case in chief. The Ackers defendants next argue that the trial court erred by failing to grant their JNOV motion and alternative new trial motion because (1) DuBois's testimony was improperly allowed, (2) numerous other errors occurred at trial, and (3) the jury's verdict is against the manifest weight of the evidence. In their sixth assignment of error, the Ackers defendants assert that because the evidence fails to support the jury's punitive damages award, the trial court should not have awarded Wright attorney fees. In their final assignment of error, the Ackers defendants argue that the trial court improperly struck Paul Ackers' affidavit when considering their JNOV and new trial motion.
 A {¶ 58} In their first assignment of error, the Ackers defendants assert that the trial court abused its discretion by permitting DuBois to testify. They claim that because Wright failed to supplement DuBois' deposition testimony as Civ.R. 26(E) requires, the court should not have allowed his testimony at trial. The Ackers defendants contend that inShumaker v. Oliver B. Cannon Sons, Inc. (1986), 28 Ohio St.3d 367,504 N.E.2d 44, the Ohio Supreme Court held that a trial court abuses its discretion when it does not exclude expert testimony that a party failed to supplement under Civ.R. 26(E). They argue that DuBois's testimony regarding proximate cause was "last minute," and that they were unable to effectively cross-examine him. The Ackers defendants further claim that DuBois exhibited a willingness to lie under oath as to the reason for his change in testimony. When the court asked DuBois why his answer was different, DuBois stated:
"I'm being allowed to assume that Mr. Brown had a wobble in his front wheel, which I don't know. If I can assume that, I can draw this opinion. But at the time I was giving the deposition, I was never asked to assume to be the fact or assume to be true that his front wheel wobbled. And the only way I can reach that opinion is being allowed to make that assumption as fact."
 {¶ 59} The Ackers defendants assert that DuBois's statement that he assumed the presence of a wobble "is laughable as the evidence of wobble was present in Defendant Brown's deposition and Mr. DuBois had reviewed Defendant Brown's deposition prior to being deposed."
 {¶ 60} Wright counters that the trial court did not abuse its discretion. Wright further argues in the alternative that if the court erred by allowing DuBois's testimony, sufficient other evidence supports the jury's finding that the motorcycle's low tire pressure, resulting from the defective rim, proximately caused the accident and Wright's injuries. Thus, any error is harmless.
 {¶ 61} Civ.R. 26(E)[11] requires a party to seasonably supplement responses to any questions directly addressed to the subject matter on which an expert is expected to testify. "This duty * * * is necessary because preparation for effective cross-examination is especially compelling where expert testimony is to be introduced." Shumaker v.Oliver B. Cannon Sons, Inc. (1986), 28 Ohio St.3d 367, 370,504 N.E.2d 44.
 {¶ 62} One purpose of Civ.R. 26(E)(1)(b) is to prevent "trial by ambush." Amerifirst Savings Bank of Xenia v. Krug (1999),136 Ohio App.3d 468, 498, 737 N.E.2d 68; Walker v. Holland (1997),117 Ohio App.3d 775, 785-786, 691 N.E.2d 719; Waste Mgt. of Ohio,Inc. v. Mid-America Tire, Inc. (1996), 113 Ohio App.3d 529,681 N.E.2d 492. "If discovery is to serve its purpose, the parties must be entitled, upon the unveiling of a contention, to a reasonable opportunity to prepare to defend against it." Waste Mgt.,113 Ohio App.3d at 533; Shumaker, 28 Ohio St.3d at 371.
 {¶ 63} "[S]ubject matter" as used in the rule has been defined as "encompass[ing] a broad scope of information under a general topic, and not to include a detailed accounting of an expert's possible testimony." See Beavercreek Local Schools v. Basic, Inc. (1991), 71 Ohio App.3d 669,680, 595 N.E.2d 360; see, also, Faulk v. International BusinessMachines Corp. (Sept. 7, 2001, Hamilton C-765 and C-778. The rule, however, "does not require a party to give notice as to each and every nuance of an expert's opinion." Tritt v. Judd's Moving Storage, Inc.
(1990), 62 Ohio App.3d 206, 211-212, 574 N.E.2d 1178; see, also, Waste Mgt., 113 Ohio App.3d at 533.
 {¶ 64} A trial court may exclude expert testimony as a sanction for violating Civ.R. 26(E)(1). Shumaker at syllabus; Jones v. Murphy (1984),12 Ohio St.3d 84, 465 N.E.2d 444; see, also, Civ.R. 37. Trial courts possess broad discretion when determining the appropriate sanction for a Civ.R. 26(E) violation. See Nakoff v. Fairview Gen. Hosp. (1996),75 Ohio St.3d 254, 662 N.E.2d 1, syllabus; Huffman v. Hair Surgeon, Inc.
(1985), 19 Ohio St.3d 83, 87, 482 N.E.2d 1248. Thus, reviewing courts should not disturb a trial court's decision regarding a discovery sanction absent an abuse of discretion. See Nakoff at syllabus; see, also, Vaught v. Cleveland Clinic Found., 98 Ohio St.3d 485, 2003-Ohio-2181,787 N.E.2d 631, at ¶ 13. In order to constitute an abuse of discretion, "`the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias.'" Id. at ¶ 13 (quotingNakoff, 75 Ohio St.3d at 254, 256).
 {¶ 65} Exclusion of otherwise reliable and probative evidence is an extreme sanction for a discovery violation. Cucciolillo v. East Ohio GasCo. (1980), 4 Ohio App.3d 36, 446 N.E.2d 175; Mulford v. Columbus S. Ohio Elec. Co. (Jan. 12, 1994), Athens App. No. CA-1548. Thus, a court should exclude evidence only when clearly necessary to enforce willful non-compliance or to prevent unfair surprise. See Nickey v. Brown
(1982), 7 Ohio App.3d 32, 454 N.E.2d 177; Mulford. In deciding whether to exclude evidence, the trial court should weigh the conduct of the party offering the expert testimony along with the level of prejudice that the opposing party suffered as a result of the discovery violation. SeeSavage v. Correlated Health Serv. (1992), 64 Ohio St.3d 42,591 N.E.2d 1216. "The existence and effect of prejudice resulting from noncompliance with the disclosure rules is of primary concern, not just the intent or motive involved." Huffman, 19 Ohio St.3d at 85. Thus, even when an expert's undisclosed testimony creates a substantial likelihood of surprise and evidence indicates that one party deliberately disrupted the free flow of information between the parties, the court may grant a continuance to allow the other party time to find and present rebuttal testimony as an alternative to excluding the expert testimony. See Stokesv. Hartzell Propeller, Inc. (Nov. 12, 1999), Miami App. Nos. 98CA57 and 98CA60 (citing Earl Evans Chevrolet, Inc. v. General Motors Corp.
(1991), 74 Ohio App.3d 266, 283, 598 N.E.2d 1187).
 {¶ 66} Courts typically exclude a party's expert testimony for failure to disclose the subject matter of that testimony when the subject matter is revealed for the first time at trial and the opposing party had no reason to anticipate it. Walker v. Holland (1997), 117 Ohio App.3d 775,788, 691 N.E.2d 719; Waste Mgt., 113 Ohio App.3d at 529, 534,681 N.E.2d 492; Fetters v. St. Francis/St. George Hosp., Inc. (Mar. 17, 2000), Hamilton App. No. C-990410. For example, in Vaught the court determined that exclusion of expert testimony was an appropriate sanction when the appellants did not identify the witness as an expert before trial and when they did not comply with court orders to do so. Specifically, the appellants missed the original deadline to identify all experts and to file expert reports and they did not comply with the extended deadline that the trial court granted. The Vaught court determined that the appellants' actions "demonstrated a disregard for the orders of the trial court and for the rules and structure of our adversarial process." Id. at ¶ 27. The court stated that "the trial court had a responsibility to ensure that there was no unfair prejudice or surprise to appellee [and] granting the motion in limine ensured such a result." Id.
 {¶ 67} In Shumaker, the Ohio Supreme Court held that the trial court abused its discretion by allowing expert testimony. In Shumaker, the plaintiff's complaint alleged that his exposure to toxic fumes caused his pulmonary and respiratory problems. Before trial, doctors diagnosed the plaintiff with pancreatic cancer, but he did not assert a claim that his pancreatic cancer was linked to his toxic fume exposure. The defendant subsequently filed a motion in limine that requested the court to exclude any evidence suggesting a causal link between the plaintiff's cancer and his exposure to the toxic fumes. The court denied the motion. At trial, the plaintiff called an expert witness who testified that "with a reasonable degree of probability, it is likely that this combination of those three chemicals could have caused the cancer."
 {¶ 68} The Ohio Supreme Court concluded, however, that the trial court abused its discretion by allowing expert testimony regarding "the mere possibility of a causal connection between the chemical exposure and [the plaintiff's] terminal cancer." Another reason the court gave for its decision was the plaintiff's failure to provide the defendant with pretrial notice regarding his claim that his toxic exposure caused his pancreatic cancer. The court noted that the plaintiff listed the expert as a witness, but failed to supplement his discovery responses to include his testimony about the potential link between the plaintiff's chemical exposure and cancer. In short, the defendant was not aware that the plaintiff intended to claim at trial that his chemical exposure caused his cancer. Under these circumstances, the Ohio Supreme Court determined that the trial court abused its discretion by allowing the expert to testify as to a causal link between the plaintiff's chemical exposure and his pancreatic cancer.
 {¶ 69} In Waste Mgt., the appellate court determined that the trial court abused its discretion by failing to exclude an expert's testimony. The defense expert witness had submitted a report stating that he was unable to come to a conclusion as to the cause of the accident in question. Several days into the trial, the witness, apparently for the first time, formed an opinion about what had caused the accident. The plaintiffs sought to exclude the expert's opinion on the ground that they had been unfairly surprised and were unable at that point in the trial to call an expert to rebut the opinion. Nevertheless, the trial court allowed the expert's testimony.
 {¶ 70} On appeal, the court ruled that the expert's "surprise opinion, undisclosed by [the defendant] during discovery and revealed for the first time during trial, created the type of unfair surprise Civ.R. 26(E)(1)(b) is intended to prevent." 113 Ohio App.3d at 534. Because the plaintiffs could not have been expected to anticipate the expert's testimony, the court determined that they did not receive a fair opportunity to respond.
 {¶ 71} In Jackson v. Booth Mem. Hosp. (1988), 47 Ohio App.3d 176,547 N.E.2d 1203, the appellate court determined that the trial court abused its discretion by allowing expert testimony that the proponent failed to properly supplement under Civ.R. 26. In Jackson, the defense's three experts testified at trial that the plaintiff died from preeclamptic shock. Before trial, however, only one of those experts identified a cause of death and stated it to be cardiac authymia.
 {¶ 72} On appeal, the plaintiff asserted that the court abused its discretion by failing to exclude the expert testimony regarding cause of death. The plaintiff argued that the defense failed to advise the plaintiff of the new theory regarding cause of death. The appellate court agreed and stated that the defense's failure to advise the plaintiffs of the new theory regarding the cause of death "smacks of ambush." Id. at 179. The court observed that the plaintiff's experts were unable to effectively testify and respond to the defense's claim regarding cause of death.
 {¶ 73} In Earl Evans Chevrolet, Inc. v. General Motors Corp. (1991),74 Ohio App.3d 266, 598 N.E.2d 1187, the court held that the trial court abused its discretion when it allowed expert testimony that the proponent had not supplemented under Civ.R. 26. In Earl Evans, the defendant requested information regarding damages, their calculation, the identities of expert witnesses, their opinions, and the bases for opinions. The plaintiffs provided the names of three expert witnesses and stated that they had no knowledge of their opinions. When the court permitted an expert to testify at trial, the defendant objected and argued that the plaintiffs violated Civ.R. 26(E) and various court orders. The trial court nonetheless allowed the testimony. The appellate court held that the trial court abused its discretion and explained:
"In the instant case, [the plaintiffs] maintain that [the defendant] knew the identity of their expert economic witness, knew that his testimony would go to alleged damages, and yet chose not to depose him. Accordingly, [plaintiffs] claim that [the defendant] cannot claim surprise. This line of argumentation is erroneous for several reasons. First, [the expert] did not complete his extensive damage calculations until well after the court imposed cutoff for discovery. Second, [the plaintiffs] clearly violated the court order requiring exchange of expert reports by September 1, 1989. Finally, the court's prior granting of the motion in limine created the appearance that the trial judge would not permit [the expert's] testimony. Any suggestion that [the defendant] could effectively depose [the expert] before he had familiarized himself with the underlying facts of the case sub judice is specious.
Accordingly, the refusal of the trial court to do either alternative was prejudicial. [The defendant] was clearly surprised and prejudiced by the failure to timely reveal the full nature, direction, substance and scope of [the expert's] testimony. Under these circumstances, fundamental fairness required that [the defendant] should have been afforded an opportunity to present a rebuttal witness to the jury on the elements presented by [the plaintiffs'] expert."
Id. at 283.
 {¶ 74} In Amerifirst, the appellate court upheld the trial court's decision to exclude the expert witness. At trial, the expert sought to testify regarding "commercial reasonableness," but before trial, he had expressed no opinion regarding commercial reasonableness.
 {¶ 75} In Tracy v. Merrell Dow Pharmaceuticals, Inc. (1991),58 Ohio St.3d 147, 569 N.E.2d 875, the appellate court determined that the trial court did not abuse its discretion by allowing an expert to testify about the cause of death when the expert's trial opinion differed from his pretrial testimony. In Tracy, the plaintiffs complained that the defendant's expert witness had been permitted to testify concerning various matters not revealed in the expert's pretrial report. One of the plaintiffs' complaints was that an expert testified about alcohol or withdrawal from alcohol as the cause of a seizure when the expert had not identified that cause in his pretrial report. They also complained about another expert's testimony that the cause of death was pulmonary edema when his pretrial report indicated that the death was due to alcohol-induced cardiomyopathy. The Ohio Supreme Court disagreed with the plaintiffs that they were misled or prejudiced and stated that "[t]here was no deviation with regard to the essential issue in the trial: whether Nicorette was the cause of * * * death." The court noted that although one of the experts altered his opinion regarding the cause of death, the alteration did not mean that the trial court abused its discretion. Essentially, the court determined that although some disparity existed between the expert's report and the expert's trial testimony as to the cause of death, the expert's opinion that the defendant's product was not to blame remained unchanged.
 {¶ 76} In Metropolitan Life Ins. Co. v. Tomchik (1999),134 Ohio App.3d 765, 732 N.E.2d 430, the court held that the trial court did not abuse its discretion by refusing to exclude a defense expert's testimony that he conducted an out-of-court experiment when the defense had not specifically informed the plaintiff before trial that the expert had conducted an out-of-court experiment. Instead, the appellate court noted that a review of the expert's pretrial report indicated that he had performed an experiment to reach his opinion. The court stated:
"[I]t is apparent from the photographs and from the statement in the report that [the expert] had made a model work piece, that [the expert's] opinion was based, in part at least, on the results of an experiment regarding kerf marks. In addition, the report makes very clear that it was [the expert's] opinion that the amputation of [the plaintiff's] thumb could not have occurred in the manner described by [the plaintiff]. At trial, [the expert] did not change his opinion in this regard. * * * The report was sufficiently clear to apprise [the plaintiff] as to [the expert's] opinion and to present [the plaintiff] with a reasonable opportunity to prepare a defense against it."
Id. at 782-783.
 {¶ 77} In Faulk v. International Business Machines (Sept. 7, 2001), Hamilton App. Nos. C-765 and C-778, the court held that the trial court did not abuse its discretion by allowing a defense expert to testify regarding causation. The plaintiff argued that the trial court erroneously permitted the defense expert to testify regarding causation when his causation opinion given at trial differed from that he gave during his deposition and when the defense did not inform the plaintiff of the change. The plaintiff asserted that the defense expert changed his theory of how the plaintiff suffered her injury. The appellate court disagreed, stating:
"Throughout this litigation, [the expert] has opined that the surge protector was the cause of [the plaintiff's] injury. That opinion did not change. [The expert] has also consistently opined that the building was appropriately wired and grounded. What changed at trial was that [the expert] was presented with a hypothetical as to what effect an ungrounded electrical system would have had on his conclusion that the surge protector was the cause of [the plaintiff's] injuries. He opined that, in that situation, the ungrounding would have resulted in an electric shock to any device plugged into the defective surge protector, whenever a person touched a metal part of the device.
This is not a case where an expert was unable to give an opinion on causation during his deposition, but did so at trial. Nor is it a situation where the expert specifically changed his or her opinion at trial. Further, this is not a case where `the subject matter [of the expert's testimony was] revealed for the first time at trial and the opposing party had no reason to anticipate it.' In fact, the issue of the consequences of an ungrounded circuit was touched upon in [the expert's] deposition. Further, since it was obvious that the two experts' opinions were premised on whether the building's electrical system was grounded, we do not believe that [the expert's] opinion concerning the hypothetical was `an ambush.'"
 {¶ 78} After our review of the pertinent case authorities, we believe that the case at bar more closely resembles those cases that concluded that excluding the expert's testimony would not be a proper sanction and differs from those cases that hold that exclusion was an appropriate sanction.
 {¶ 79} For example, we believe that the case at bar differs fromVaught. In the case sub judice, Wright identified DuBois as an expert and the Ackers defendants were informed of his opinion that low tire pressure as a proximate cause of the accident was consistent with the data DuBois relied upon. Unlike Vaught, Wright did not utterly fail to identify DuBois as a witness. Moreover, Wright advised the Ackers defendants of the general nature of DuBois testimony. They knew that Wright wanted DuBois to express an opinion concerning proximate cause. Simply because no one, before trial, had asked DuBois the exact hypothetical posed to him during trial or because Wright did not advise the Ackers defendants before trial that her counsel intended to ask the hypothetical does not mean that his testimony unfairly surprised the Ackers defendants or constituted trial by ambush. This was not a case in which the expert (DuBois) lacked any opinion concerning proximate cause before trial. Additionally, the Ackers defendants' counsel possessed ample opportunity to cross-examine DuBois concerning his proximate cause opinion testimony based upon his assumption that a wobble occurred. The Ackers defendants' counsel pointed out at trial and argued that DuBois could not find physical evidence to substantiate Brown's claim that a wobble occurred. We believe that DuBois's trial testimony was a nuance of his opinion that Wright had no obligation to disclose.
 {¶ 80} The case at bar also differs from Shumaker. In Wright's case, her claim always was that the defective tire rim and low tire pressure caused the accident and her injuries. Unlike the Shumaker defendant who did not know the plaintiff intended to establish a link between his chemical exposure and his pancreatic cancer, the Ackers defendants were fully aware of Wright's claim that low tire pressure caused the accident and her injuries. While the Ackers defendants may have been surprised that Wright's counsel asked a hypothetical that he previously had not asked, and which elicited a response the Ackers defendants certainly were not happy to hear, this is not the type of unfair surprise or trial by ambush envisioned under Civ.R. 26(E) and supporting case law.
 {¶ 81} The facts in the case sub judice also differ from those inWaste Mgt. Unlike Waste Mgt., in which the expert apparently had no opinion and then subsequently formed one, in the case at bar DuBois formed an opinion, although he was unable, initially, to express his opinion within a reasonable degree of scientific certainty. At trial, because Wright's counsel formed the question as a hypothetical (and included the assumption that the motorcycle's front wheel wobbled), DuBois modified his opinion so as to express it within a reasonable degree of scientific certainty. We do not believe that DuBois's ability to testify within a reasonable degree of scientific certainty entirely changed his opinion so as to unfairly surprise the Ackers defendants.
 {¶ 82} The case at bar also differs from Jackson because DuBois did not testify as to a new theory regarding the cause of the accident. Rather, DuBois continued to hold the same opinion and he did not change his opinion regarding the proximate cause of the accident. DuBois's ability to express his opinion within a reasonable degree of scientific certainty does not smack of ambush. Instead, once Wright became aware that the court would not allow DuBois's testimony unless he expressed it within a reasonable degree of scientific certainty, the Ackers defendants could have anticipated that she would attempt to frame questions so as to enable DuBois to express his opinion within a reasonable degree of scientific certainty.
 {¶ 83} Unlike Earl Evans, in the case at bar the Ackers defendants did not suffer unfair prejudice. Once aware of DuBois's testimony regarding proximate cause, the trial court heard arguments from both sides and questioned DuBois regarding his testimony. The Ackers defendants then possessed ample opportunity to question DuBois regarding his opinion and the underlying assumption. We believe that the trial court appropriately exercised its discretion and did not cause the Ackers defendants unfair prejudice.
 {¶ 84} Unlike Amerifirst, in the case at bar DuBois previously mentioned his opinion regarding the proximate cause of the accident, although he was unable to state his opinion at that time to a reasonable degree of scientific certainty. In Amerifirst, however, the expert never before mentioned what he sought to testify to at trial.
 {¶ 85} Tracy is similar to the case at bar. Throughout the entire course of litigation, DuBois's opinion that the defective tire rim was a cause of the accident remained the same. The issue that arose was the expert's ability to express that opinion within a reasonable degree of scientific certainty.
 {¶ 86} We further believe that Metropolitan Life Ins. is similar to the case sub judice. DuBois's trial testimony differed more in form than in substance from his deposition testimony. His deposition testimony sufficiently informed the Ackers defendants of his opinion that the defective tire rim was a proximate cause of the accident and the defendants had sufficient time to prepare a defense. We again note that Civ.R. 26(E)(1)(b) does not require a party to disclose every nuance of an expert's opinion. Rather, the purpose of discovery is met when, as in the case at bar, the opposing party is adequately informed as to the subject matter about which the expert is expected to testify.Metropolitan Life Ins., 134 Ohio App.3d at 783.
 {¶ 87} We additionally find the reasoning set forth in Faulk applicable. DuBois's opinion that the defective wheel was a proximate cause of the accident remained the same throughout the litigation. What changed, however, was his ability to include additional information for his consideration and to express his opinion within a reasonable degree of scientific certainty. Thus, like Faulk, this is not a case in which the expert was unable to give an opinion regarding causation during a deposition but did so at trial. It also is not a case in which the expert specifically changed his opinion or in which the substance of his testimony was revealed for the first time at trial and the opposing party had no reason to anticipate it.
 {¶ 88} Moreover, nothing in the record suggests that Wright deliberately disrupted the free flow of information between the parties and nothing in Civ.R. 26(E) suggests that expert testimony will always be inadmissible as a consequence of a party's noncompliance with Civ.R. 26(E). Stokes v. Hartzell Propeller, Inc. (Nov. 12, 1999), Miami App. Nos. 98CA57 and 98CA60. Consequently, we conclude that the trial court did not abuse its discretion by allowing DuBois's testimony.
 {¶ 89} Accordingly, based upon the foregoing reasons, we overrule the Ackers defendants' first assignment of error.
 B {¶ 90} In their second, third, and fourth assignments of error, the Ackers defendants argue that the trial court erred by failing to direct a verdict in their favor following Wright's opening statement[12] and after her case-in-chief. They contend that the trial court should have directed a verdict in their favor regarding the punitive damage claim after her opening statement because neither in her opening statement nor in her complaint did she: (1) allege sufficient facts to show malice, which is necessary to support a punitive damage award, (2) allege that she would prove punitive damages by clear and convincing evidence, or (3) state that the Ackers defendants exhibited a conscious disregard for the rights and safety of other persons or engaged in conduct carrying a great probability of causing substantial harm.
 {¶ 91} The Ackers defendants assert that the trial court should have directed a verdict in their favor regarding Wright's punitive damages claim after her case-in-chief because she failed to present sufficient evidence to allow a reasonable jury to conclude that they acted with malice. They claim that Wright failed to present any evidence showing that the Ackers defendants exhibited a conscious disregard for the rights and safety of other persons or engaged in conduct carrying a great probability of substantial harm. The Ackers defendants argue that their knowledge that the motorcycle tire leaked does not establish that selling the motorcycle to Brown had a great probability of causing harm. The Ackers defendants further contend that the court should have directed a verdict in their favor because the court improperly permitted DuBois to testify and without his testimony, Wright had no evidence to show that the defective tire was a proximate cause of her injuries.
 {¶ 92} Wright counters that the trial court appropriately denied the Ackers defendants' two directed verdict motions. She argues that both her complaint and her opening statement contained sufficient allegations to allow her punitive damage claim to survive the Ackers defendants' directed verdict motion upon opening statements.
 {¶ 93} Wright asserts that she presented sufficient evidence during her case-in-chief to allow reasonable minds to reach different conclusions regarding whether the Ackers defendants acted with malice; that is, whether the defendants exhibited a conscious disregard for the rights and safety of other persons or engaged in conduct carrying a great probability of causing substantial harm. Wright contends that the following facts support a malice finding: (1) the Ackers defendants had actual knowledge of the air leak in the tire rim before Brown purchased the motorcycle; (2) the Ackers defendants had an opportunity to decline the sale of the motorcycle until the tire had been replaced; (3) the Ackers defendants could have told Brown to find another way home; (4) ASK employee Eck stated that the motorcycle was dangerous to ride and should not have been sold to Brown; (5) Eck stated that the owner's manual provided a warning with regard to tire pressure and a warning indicated a potential hazard which could result in injury or death; (6) Wiseman and Ackers, Inc. were aware of the great probability of causing substantial harm to the passengers and driver of the motorcycle with the defective wheel — Wiseman stated that he "hit the roof" when he learned that the motorcycle was leaving the lot that day and expressed his concern to Mrs. Ackers; (7) Wiseman considered the leaking rim to be dangerous and not fit for use on the highway until repaired, but did not tell Brown that the motorcycle was dangerous; (8) Wiseman acknowledged that low tire pressure could affect handling, including handling around the curve and acknowledged that low tire pressure could result in injury or death; (9) Wiseman "raised hell" with the owner; (10) Wiseman did not attempt to determine the rate of the leak because he felt it was irrelevant; (11) Wiseman red flagged the motorcycle in the computer to prevent its sale; (12) upon hearing of the sale and going through the roof, Wiseman entered a "M.O.O.S.E." order for the front wheel indicating it was to be out of service; (13) Wiseman did not advise Brown of the red-flagging but indicated that the air loss would not be noticeable for two weeks; (14) Ackers sold and delivered the motorcycle with a passenger helmet after Brown advised them that he would be riding with his girlfriend; (15) Ackers personnel had an opportunity to advise Brown of the danger when Brown's boss was present and available to take him back to Athens; and (16) Ackers and Wiseman knew that Brown planed to carry a passenger on the motorcycle but did not warn him of the possible consequences.
 {¶ 94} Wright further disputes the Ackers defendants' assertion that they were entitled to a directed verdict because she failed to present sufficient proximate cause evidence. She asserts that the trial court properly allowed DuBois's testimony and that his testimony allows reasonable minds to reach different conclusions regarding proximate cause.
 1. Directed Verdict Standard {¶ 95} Pursuant to Civ.R. 50(A)(1), a party may move for a directed verdict on the opponent's opening statement, at the close of opponent's evidence, or at the close of all evidence. Civ.R. 50(A)(4) sets forth when a trial court may direct a verdict:
When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.
 {¶ 96} "A motion for directed verdict * * * does not present factual issues, but a question of law, even though in deciding such a motion, it is necessary to review and consider the evidence." O'Day v. Webb (1972),29 Ohio St.2d 215, 280 N.E.2d 896, paragraph three of the syllabus; see, also, Wagner v. Roche Laboratories (1996), 77 Ohio St.3d 116, 119,671 N.E.2d 252. Because we are presented with a question of law, we apply a de novo standard of review. See Goodyear Tire Rubber Co. v. AetnaCas. Sur. Co. (2002), 95 Ohio St.3d 512, 514, 769 N.E.2d 835;Cleveland Elec. Illum. Co. v. Pub. Util. Comm. (1996), 76 Ohio St.3d 521,523, 668 N.E.2d 889.
 {¶ 97} When a trial court rules on a directed verdict motion, it must not consider either the weight of the evidence or witness credibility. See Texler v. D.O. Summers Cleaners Shirt Laundry Co. (1998),81 Ohio St.3d 677, 679-80, 693 N.E.2d 271; Wagner v. Roche Laboratories
(1996), 77 Ohio St.3d 116, 671 N.E.2d 287; Strother v. Hutchinson
(1981), 67 Ohio St.2d 282, 284, 423 N.E.2d 467. Instead, a directed verdict motion tests the legal sufficiency of the evidence. See Eldridgev. Firestone Tire Rubber Co. (1985), 24 Ohio App.3d 94, 96,493 N.E.2d 293. "`[I]f there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied.'"Strother, 67 Ohio St.2d at 284-285 (quoting Hawkins v. Ivy (1977),50 Ohio St.2d 114, 115, 363 N.E.2d 367) (citation omitted); see, also,Texler. The Civ.R. 50(A)(4) "reasonable minds" test "calls upon the court only to determine whether there exists any evidence of substantial probative value in support of [the nonmoving party's claims]." Wagner,77 Ohio St.3d at 1191-20; see, also, Texler, 81 Ohio St.3d at 679-80;Ruta v. Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66, 68-69,430 N.E.2d 935. Thus, a court considering a directed verdict motion must determine not whether one version of the facts is more persuasive than the other, but instead, must determine whether the trier of fact could reach only one result under the theories of law presented in the complaint. See Evans v. Dayton Power and Light Co., Adams App. No. 03CA763, 2004-Ohio-2183 (citing Ramage v. Cent. Ohio Emergency Services,Inc. (1992), 64 Ohio St.3d 97, 109, 592 N.E.2d 828).
 {¶ 98} Furthermore, when a party moves for a directed verdict on the opening statement of counsel, the trial court "should exercise great caution in sustaining [the] motion." Brinkmoeller v. Wilson (1975),41 Ohio St.2d 223, 325 N.E.2d 233, syllabus. To sustain a directed verdict motion made upon opening statement, "it must be clear that all the facts expected to be proved, and those that have been stated, do not constitute a cause of action or a defense, and the statement must be liberally construed in favor of the party against whom the motion has been made." Id. A trial court does not err by granting a directed verdict motion upon opening statements "if, engaging in every reasonable inference from facts favorable to the party against whom the motion is directed, the proposed proof would not sustain a claim upon which relief could be granted." Phillips v. Borg-Warner Corp. (1972), 32 Ohio St.2d 266,268, 291 N.E.2d 736; see, also, Ruta, 69 Ohio St.2d at 69; U.S. AviationUnderwriters, Inc. v. B.F. Goodrich Co. (2002), 149 Ohio App.3d 569,574, 778 N.E.2d 122.
 {¶ 99} When a court determines whether to direct a verdict following a party's opening statement, the court must consider both the opening statement and the allegations in the complaint to determine if they, when construed liberally in the nonmoving party's favor, amount to a justiciable claim for relief.
 {¶ 100} Nu-Trend Homes, Inc. v. Law Offices of DeLibera, Lyons Bibbo, Franklin App. No. 01AP-1137, 2003-Ohio-1633; Graham v. CedarPoint, Inc. (1997), 124 Ohio App.3d 730, 734, 707 N.E.2d 554.
 {¶ 101} In the case at bar, the Ackers defendants first assert that the trial court should have directed a verdict in their favor regarding Wright's punitive damages claim at the close of Wright's opening statement.
 {¶ 102} To sustain a punitive damages claim, a plaintiff must prove, by clear and convincing evidence, that the defendant acted with actual malice. See Cabe v. Lunich (1994), 70 Ohio St.3d 598, 601, 640 N.E.2d 159. "Clear and convincing evidence is that measure or degree of proof which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."Cross v. Ledford (1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus. Actual malice constitutes: (1) that state of mind under which a person's conduct is characterized by hatred, ill will, or a spirit of revenge; or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. See, e.g., Preston v. Murty (1987), 32 Ohio St.3d 334,512 N.E.2d 1174; Rice v. CertainTeed Corp. (1999), 84 Ohio St.3d 417, 422,704 N.E.2d 1217. "Something more than mere negligence is always required before an award of punitive damages may be made. `This concept is reflected in the use of such terms as "outrageous," "flagrant," and "criminal." The concept requires a finding that the probability of harm occurring is great and that the harm will be substantial.' Preston,32 Ohio St.3d at 335-336, 512 N.E.2d at 1176." Cabe, 70 Ohio St.3d at 602.
 {¶ 103} In the case at bar, we believe that the trial court properly denied the Ackers defendants' directed verdict motion made upon Wright's opening statement and at the close of her case-in-chief. First, Wright's opening statement and her complaint contain sufficient facts, if true, to support a punitive damage award. Her July 16, 2001 second amended complaint specifically contains a request for punitive damages. She further alleged that the Ackers defendants' conduct constituted "gross negligence and/or willful and/or wanton misconduct entitling Plaintiff Crystal L. Wright to a recovery of punitive damages." Simply because she did not utter the words, "clear and convincing evidence" or "conscious disregard for the rights and safety of others that has a great probability of causing substantial harm," does not mean that she failed to sufficiently allege either in her opening statement or in her complaint sufficient facts to support a punitive damage award. Additionally, the facts alleged in her opening statement allow reasonable minds to differ regarding her entitlement to punitive damages against Wiseman and the dealership.
 {¶ 104} Second, during her case-in-chief Wright presented sufficient evidence to allow reasonable minds to differ as to whether the Ackers defendants acted with malice. The evidence shows that: (1) the dealership knew that the motorcycle tire rim was defective and caused the tire to lose air pressure; (2) the dealership knew that low tire pressure on a motorcycle wheel could cause serious injury; and (3) despite this knowledge, the dealership allowed Brown to take delivery of the motorcycle, knowing that he would be riding it at least back to Athens. By allowing Brown to take the motorcycle in spite of its defective condition, the Ackers defendants exhibited a conscious disregard for the rights and safety of others. As to the requirement that releasing the defective motorcycle carried a great probability of harm, Castin testified that releasing a motorcycle with a tire that leaked air was "dangerous to life." Many other witnesses, including Wiseman, testified that the motorcycle was potentially dangerous. While none of the Ackers defendants may have known that the accident certainly would happen, they at least knew that a leaking tire on the front wheel of a motorcycle carried a risk of severe injury. Wiseman best exemplified this knowledge by "going through the roof" and being upset that Brown would be taking the motorcycle. From his reaction, the jury could have inferred that Wiseman believed that allowing the motorcycle to leave in the defective condition posed a grave and great probability of substantial harm. Otherwise, he may not have been so upset. Thus, we believe that the evidence sufficiently shows that the Ackers defendants exhibited a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm
 {¶ 105} The Ackers defendants further assert that the court should have directed a verdict in their favor because DuBois should not have been allowed to testify regarding proximate cause and without his testimony, Wright lacked proximate cause evidence. As we concluded in the Ackers defendants' first assignment of error, however, the trial court did not abuse its discretion by allowing DuBois to testify regarding proximate cause. His testimony constitutes some competent evidence establishing the proximate cause element and the court properly denied the Ackers defendants' directed verdict motion due to lack of proximate cause evidence.
 {¶ 106} Accordingly, based upon the foregoing reasons, we overrule the Ackers defendants' second, third, and fourth assignments of error.
 C {¶ 107} In their fifth assignment of error, the Ackers defendants argue that the trial court erred by failing to grant their JNOV motion or their alternative new trial motion. They assert that the court should have granted their JNOV motion because: (1) the court wrongly allowed DuBois to testify regarding proximate cause and without his testimony, Wright did not have sufficient evidence to show proximate causation between the defective wheel and her injuries; and (2) Wright failed to present sufficient evidence showing a conscious disregard for the rights and safety of others that had a great probability of causing substantial harm.
 {¶ 108} The Ackers defendants additionally contend that the trial court improperly denied their new trial motion. They claim that a new trial is warranted because: (1) under Civ.R. 59(A)(1), an irregularity in the proceedings occurred when Wright failed to properly supplement DuBois's testimony; (2) under Civ.R. 59(A)(2) and (3), Wright's counsel's engaged in misconduct by failing to supplement DuBois's testimony, and DuBois's proximate cause testimony at trial surprised the Ackers defendants; (3) under Civ.R. 59(A)(7) and (9), the judgment is contrary to law and an error of law occurred at trial because the jury's verdict is inconsistent with one of the interrogatories, and because the jury's punitive damage award is contrary to law; (4) under Civ.R. 59(A)(6), the judgment is against the manifest weight of the evidence; and (5) under the catch-all provision, the rules were not followed and the jury's verdict regarding punitive damages was not the truth.
 1. Judgment Notwithstanding the Verdict {¶ 109} A motion for judgment notwithstanding the verdict, like a motion for a directed verdict, tests the legal sufficiency of the evidence. See Posin v. A.B.C. Motor Court Hotel, Inc. (1976),45 Ohio St.2d 271, 344 N.E.2d 334; McKenney v. Hillside Dairy Corp.
(1996), 109 Ohio App.3d 164, 671 N.E.2d 1291. Thus, the standard of review when ruling on a motion for judgment notwithstanding the verdict is the same as that used when ruling on a directed verdict motion. SeeWagner v. Roche Laboratories (1996), 77 Ohio St.3d 116, 121,671 N.E.2d 252, fn. 2, citing Gladon v. Greater Cleveland RegionalTransit Auth. (1996), 75 Ohio St.3d 312, 318-319, 662 N.E.2d 287; Posin,45 Ohio St.3d at 275. If the record contains any competent evidence, when construed most strongly in favor of the nonmoving party, upon which reasonable minds could reach different conclusions, the court must deny the motion. See Meyers v. Hot Bagels Factory, Inc. (1999),131 Ohio App.3d 82, 92, 721 N.E.2d 1068. Like the directed verdict motion, a JNOV motion also presents a question of law, which we review de novo. Id., citing Tulloh v. Goodyear Atomic Corp. (1994),93 Ohio App.3d 740, 639 N.E.2d 1203.
 {¶ 110} The Ackers defendants' argument regarding the trial court's denial of their JNOV motion basically repeats the arguments they presented regarding the trial court's denial of their directed verdict motions. We addressed each argument in our previous discussion of the Ackers defendants' second, third, and fourth assignments of error and will not repeat them here. For those same reasons, we conclude that the trial court did not err by denying their JNOV motion.
 2. New Trial {¶ 111} Civ.R. Rule 59 sets forth the reasons why a trial court may grant a new trial:
(A) Grounds
A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:
(1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;
(2) Misconduct of the jury or prevailing party;
(3) Accident or surprise which ordinary prudence could not have guarded against;
(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;
(5) Error in the amount of recovery, whether too large or too small, when the action is upon a contract or for the injury or detention of property;
(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;
(7) The judgment is contrary to law;
• * * *
(9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application;
In addition to the above grounds, a new trial may also be granted in the sound discretion of the court for good cause shown.
 {¶ 112} A trial court generally possesses discretion when ruling on a new trial motion, and a reviewing court should not disturb its decision absent an abuse of that discretion. See, e.g., Mannion v. Sandel (2001),91 Ohio St.3d 318, 321, 744 N.E.2d 759; Koch v. Rist (2000),89 Ohio St.3d 250, 251, 730 N.E.2d 963. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemorev. Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140; see, also,Koch; Berk v. Matthews (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301.
 a. Under Civ.R. 59(A)(1), an Irregularity in the Proceedings Did Not Occur That Entitles the Ackers Defendants to a New Trial {¶ 113} The Ackers defendants claim that the trial court should have ordered a new trial because it improperly allowed DuBois's testimony, which amounted to an irregularity in the proceedings. We disagree.
 {¶ 114} Civ.R. 59(A)(1) provides a trial court with discretion to grant a new trial when an irregularity in a court proceeding prevents a party from having a fair trial. The rule preserves the integrity of the judicial system when the presence of serious irregularities in a proceeding could have a material adverse effect on the character of and public confidence in judicial proceedings. See, e.g., Koch; Meyer v.Srivastava (2001), 141 Ohio App.3d 662, 752 N.E.2d 1011; Mullins v.Inderbitzen, Lucas App. No. L-03-1121, 2004-Ohio-1121.
 {¶ 115} The term "irregularity" in the context of a motion for a new trial is historically described as "very comprehensive," and a departure from the due proceeding whereby a party, "with no fault on his part, has been deprived of some right or benefit otherwise available to him."Sherwin-Williams Co. v. Globe Rutgers Fire Ins. Co. (1912), 20 Ohio C.C.(N.S.) 151, quoted in In re Guardianship of Pierce, Ross App. No. 03CA2712, 2003-Ohio-3997, at ¶ 24.
 {¶ 116} In our discussion of the Ackers defendants' first assignment of error, we determined that the trial court did not abuse its discretion by permitting DuBois to testify, despite the Ackers defendants' claim that Wright failed to supplement his testimony under Civ.R. 26(E). In light of our decision, no irregularity occurred in the proceedings that materially prejudiced the Ackers defendants' rights so as to warrant a new trial under Civ.R. 59(A)(1).
 b. {¶ 117} Under Civ.R. 59(A)(2) and (3), Wright's Counsel Did Not Engage In Misconduct or Cause the Ackers Defendants Unfair Surprise
 {¶ 118} The Ackers defendants next argue that Wright's counsel engaged in misconduct by failing to comply with Civ.R. 26(E) and that DuBois's testimony regarding proximate cause surprised them, either of which entitles them to a new trial under Civ.R. 59(A)(2) and (3). We do not agree.
 {¶ 119} Civ.R. 59(A)(2) permits a new trial if there is misconduct by the prevailing party. Seibert v. Murphy, Scioto App. No. 02CA2825, 2002-Ohio-6454. The decision whether alleged misconduct sufficiently tainted the verdict with passion or prejudice so as to warrant a new trial lies within the trial court's sound discretion. Lance v. Leohr
(1983), 9 Ohio App.3d 297, 298, 459 N.E.2d 1315. The trial court is in the best position to assess whether counsel's conduct was intentional and what impact it had on the jury. Meyers v. Hot Bagels Factory, Inc.
(1999), 131 Ohio App.3d 82, 100, 721 N.E.2d 1068. Thus, "[b]efore a reviewing court will disturb the exercise of the trial court's discretion, the record must clearly demonstrate highly improper argument by counsel which tends to inflame the jury." Lance, 9 Ohio App.3d at 298;Stephens v. Vick Express, Inc., Butler App. Nos. CA2002-03-066 and CA2002-03-074, 2003-Ohio-1611.
 {¶ 120} In the case sub judice, the trial court apparently found that Wright did not engage in misconduct. We previously determined that the court did not abuse its discretion by permitting DuBois to testify, despite the Ackers defendants' claim that Wright failed to comply with Civ.R. 26(E). No evidence of flagrant misconduct exists. The trial court did not, therefore, abuse its discretion by determining that the Ackers defendants were not entitled to a new trial under Civ.R. 59(A)(2).
 {¶ 121} The Ackers defendants additionally claim that because Wright's counsel did not inform them before trial that DuBois would express an opinion regarding proximate cause within a reasonable degree of scientific certainty, his testimony surprised them and entitles them to a new trial under Civ.R. 59(A)(3). Civ.R. 59(A)(3) allows a trial court to order a new trial based upon "surprise which ordinary prudence could not have guarded against." One purpose of the Civil Rules is to "eliminate surprise" and this is accomplished by requiring the "free flow of accessible information." Jones v. Murphy (1984), 12 Ohio St.3d 84, 86,465 N.E.2d 444; see, also, Paugh Farmer, Inc. v. Menorah Home forJewish Aged (1984), 15 Ohio St.3d 44, 45, 472 N.E.2d 704. To warrant a new trial on Civ.R. 59(A)(3) "surprise" grounds, the complaining party must show unfair surprise. See, generally, On Line Logistics, Inc. v.Amerisource Corp., Cuyahoga App. No. 82056, 2003-Ohio-5381. A court may grant a motion for a mistrial when a party is confronted by surprising new facts or conditions which were unknown despite reasonable trial preparation. Cummings v. B.F. Goodrich Co. (1993), 86 Ohio App.3d 176,188, 620 N.E.2d 209; Parsch Lumber Co. v. McGrath (1930),37 Ohio App. 37, 173 N.E. 629.
 {¶ 122} In Geygan v. Queen City Grain Co. (1991), 71 Ohio App.3d 185,199, 593 N.E.2d 328, the court considered whether a party's alleged failure to comply with Civ.R. 26(E) resulted in surprise at trial that warranted a new trial under Civ.R. 59(A)(3). The court first determined that the party had not failed to comply with Civ.R. 26(E). It then noted that the opposing party had ample time to prepare for the witness's testimony and was "well aware of its subject matter." Under such circumstances, the court determined that the trial court properly denied the new trial motion.
 {¶ 123} Similarly, in the case at bar, Wright did not violate Civ.R. 26(E). The Ackers defendants had ample time to prepare for DuBois's testimony and knew that he had an opinion regarding proximate cause. Simply because they did not anticipate that Wright would ask a hypothetical (that concluded an assumption that the motorcycle's front wheel wobbled) in order to have DuBois express his proximate cause opinion within a reasonable degree of scientific certainty does not mean that they were unfairly surprised.
 {¶ 124} Consequently, we believe that the trial court did not abuse its discretion by denying the Ackers defendants new trial motion under Civ.R. 59(A)(3).
 c. {¶ 125} Under Civ.R. 59(A)(7) and (9), the Judgment Is Not Contrary to Law and an Error of Law did not Occur at Trial
 {¶ 126} The Ackers defendants argue that they are entitled to a new trial under Civ.R. 59(A)(7) or (A)(9) because: (1) the jury found in an interrogatory that Brown's use of the motorcycle was unforeseeable, and, in light of this finding, Wright cannot establish the duty element of her negligence claim against the Ackers defendants; and (2) Wright failed to present any evidence demonstrating malice entitling her to a punitive damage award. We disagree.
 {¶ 127} Civ.R. 59(A)(7) allows a judge to grant a new trial if the judgment is contrary to law. When a party asserts that a judgment is contrary to law pursuant to Civ.R. 59(A)(7), the question presented is one of law which requires a review of facts and evidence; it does not involve a consideration of the weight of the evidence or credibility of the witnesses. See Pangle v. Joyce (1996), 76 Ohio St.3d 389, 391,667 N.E.2d 1202, citing O'Day v. Webb (1972), 29 Ohio St.2d 215,280 N.E.2d 896, paragraph two of the syllabus. Thus, a court reviewing a trial court's decision regarding a Civ.R. 59(A)(7) new trial motion is to decide whether the judge erred as a matter of law. See O'Day,29 Ohio St.2d 215, paragraph one of the syllabus; Pangle,76 Ohio St.3d at 391. "Where a new trial is granted by a trial court, for reasons which involve no exercise of discretion but only a decision on a question of law, the order granting a new trial may be reversed upon the basis of a showing that the decision was erroneous as a matter of law."Rohde v. Farmer (1970), 23 Ohio St.2d 82, 262 N.E.2d 685, paragraph two of the syllabus; see, also, Ferguson v. Dyer, 149 Ohio App.3d 380,2002-Ohio-1442, 777 N.E.2d 850, at ¶ 11.
 {¶ 128} Civ.R. 59(A)(9) provides that the trial court may grant a new trial based upon "[e]rror of law occurring at the trial and brought to the attention of the trial court." Like Civ.R. 59(A)(7), appellate review of a Civ.R. 59(A)(9) motion is de novo, rather than under an abuse-of-discretion standard.
 {¶ 129} First, we have already outlined the evidence that supports the jury's punitive damage verdict when we discussed the Ackers defendants' arguments regarding their directed verdict and JNOV motions. For those same reasons, their contention that the punitive damage verdict is contrary to law and entitles them to a new trial is without merit.
 {¶ 130} Further, the Ackers defendants' claim that the affidavit evidence they submitted with their new trial motion shows that the jury's punitive damage verdict is contrary to law is meritless. The trial court struck the affidavit evidence, and, thus, it is not properly before this court.[13]
 {¶ 131} Second, the Ackers defendants did not timely object to the jury's interrogatory and the verdict. Generally, a party must bring alleged inconsistencies in jury interrogatories to the trial court's attention before the jury is discharged. See Bicudo v. LexfordProperties, Inc., 157 Ohio App.3d 509, 2004-Ohio-3202, 812 N.E.2d 315;Avondet v. Blankstein (1997), 118 Ohio App.3d 357, 368,692 N.E.2d 1063. Otherwise, the party waives the issue for appellate review. Bicudo; Chesney v. Jowers, Cuyahoga App. No. 82270, 2003-Ohio-6614 (stating that by failing to object to the alleged inconsistency before the jury was discharged and instead raising the argument in a JNOV motion resulted in a waiver). The policy reasons behind the rule are "(1) to promote the efficiency of trials by permitting the reconciliation of inconsistencies without the need for a new presentation of evidence to a different trier of fact, and (2) to prevent jury shopping by litigants who might wait to object to an inconsistency until after the original jury is discharged." Greynolds v. Kurman (1993), 91 Ohio App.3d 389,395, 632 N.E.2d 946.
 {¶ 132} In the case at bar, as the trial court noted when it ruled on the Ackers defendants' post-trial motions, the defendants did not request the court to check for inconsistencies and once the court read the verdict and interrogatories, they did not allege that the interrogatories were inconsistent with the verdict. Thus, they waived the alleged error. Assuming, however, they had not waived the error, we agree with Wright's position that the interrogatories are not inconsistent with the verdict. Paragraph three of Civ.R. 49(B) details the procedure a trial court must follow when entering judgment on a jury verdict accompanied by interrogatories:
When the general verdict and the answers are consistent, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. When one or more of the answers is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial.
 {¶ 133} The purpose of using interrogatories is to "test the jury's thinking in resolving an ultimate issue so as not to conflict with its verdict." Riley v. Cincinnati (1976), 46 Ohio St.2d 287, 298,348 N.E.2d 135. The goal is to have the jury return a general verdict and interrogatory answers that complement the general verdict. See Evans v.Dayton Power and Light Co., Adams App. No. 03CA763, 2004-Ohio-2183, at ¶ 49. A prevailing party is not required to prove consistency between the verdict and a special finding. See id. at ¶ 58. Rather, the party challenging a general verdict must show that the special findings, when considered together, are inconsistent and irreconcilable with the general verdict. Becker v. BancOhio Natl. Bank (1985), 17 Ohio St.3d 160, 162-163,478 N.E.2d 776; Evans at ¶ 58.
 {¶ 134} In the case sub judice, the jury's answer to the interrogatory does not conflict with the general verdict. The interrogatory related to Brown's cross-claim alleging that the Ackers defendants were liable for his injuries and did not relate to Wright's claims. The jury determined that Brown's misuse of the motorcycle barred his claim. Essentially, the jury's finding means that Brown could not establish the foreseeability element of his claim. This finding does not mean, however, that the Ackers defendants could not or should not have foreseen that Brown would take a passenger on the motorcycle who could become injured. Brown's misuse of the product does not bar the innocent party's claim.
 {¶ 135} Furthermore, the court instructed the jury:
"The defendants claim that Timothy Brown misused the subject motorcycle in a way that the defendants did not intend and could not have foreseen.
* * *
evidence that cross-claimant misused the motorcycle in a way not — that was not foreseeable, then you must find in favor of the defendants on cross-claimant's product liability claim.
If you find cross-claimant's injuries result — directly resulted from using the product improperly, or from use of the product in an unreasonable manner, then the cross-claimant cannot recover, and you must return a verdict in favor of the defendants as to the cross-claimant's claims."
 {¶ 136} All parties were well-aware of the jury instructions and interrogatories before the court gave the instructions. Had the Ackers defendants thought that Brown's misuse of the product would bar Wright's claims, they could have requested the trial court to so instruct the jury.
 {¶ 137} Accordingly, the trial court did not err by overruling the Ackers defendants new trial motion under Civ.R. 59(A)(7) or (9).
 d. Under Civ.R. 59(A)(6), The Judgment is Not Against the Manifest Weight of the Evidence {¶ 138} The Ackers defendants further contend that the judgment is against the manifest weight of the evidence, which warrants a new trial under Civ.R. 59(A)(6).
 {¶ 139} Under Civ.R. 59(A)(6), a trial court may grant a new trial if "[t]he judgment is not sustained by the weight of the evidence * * *." The trial court has broad discretion in deciding whether to grant a new trial under Civ.R. 59(A)(6), and a reviewing court will not reverse the trial court's decision absent an abuse of that discretion. See Pena v.Northeast Ohio Emergency Affiliates, Inc. (1995), 108 Ohio App.3d 96,103, 670 N.E.2d 268. A court does not abuse its discretion unless it acted unreasonably, arbitrarily or unconscionably. Id.; Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. Furthermore, a reviewing court will not reverse a judgment as being against the manifest weight of the evidence when some competent, credible evidence supports the judgment. C.E. Morris Co. v. Foley Construction Co. (1978),54 Ohio St.2d 279, 376 N.E.2d 578, syllabus; Pena,108 Ohio App.3d at 104.
 {¶ 140} When ruling on a Civ.R. 59(A)(6) new trial motion, the trial court must "weigh the evidence and pass on the credibility of the witnesses; not in the substantially unlimited sense that such weight and credibility is passed on originally by the jury, but in the more restricted sense of whether it appears to the trial court that a manifest injustice has been done, and that the verdict is against the manifest weight of the evidence." Rohde v. Farmer (1970), 23 Ohio St.2d 82,262 N.E.2d 685, paragraph three of the syllabus; see, e.g., Porter v.Keefe, Erie App. No. E-02-018, 2003-Ohio-7267, at ¶ 101. A trial court may not order a new trial based simply on a difference of opinion between it and the jury. See Verbon v. Pennese (1982), 7 Ohio App.3d 182, 183,454 N.E.2d 976; Poske v. Mergl (1959), 169 Ohio St. 70, 73-74,157 N.E.2d 344. The trial court's job is not to judge the credibility of the evidence, but to judge whether the evidence has a "semblance of credibility." Verbon, 7 Ohio App.3d at 183. Because "the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the `surrounding circumstances and atmosphere of the trial,'" the reviewing court must "view the evidence favorably to the trial court's action rather than to the original jury's verdict." Malonev. Courtyard by Marriott L.P. (1996), 74 Ohio St.3d 440, 448,659 N.E.2d 1242; Rohde, 23 Ohio St.2d at 94; see, also, Griffin v. MDKFood Serv., Inc., 155 Ohio App.3d 698, 2004-Ohio-133, 803 N.E.2d 834.
 {¶ 141} In the case sub judice, we do not believe that the trial court abused its discretion when it determined that the jury's verdict is not against the manifest weight of the evidence. Substantial competent and credible evidence supports the jury's finding that the defective tire rim was a proximate cause of the accident. DuBois so testified. Although the Ackers defendants complain that his testimony was not credible, we do not find it so wholly lacking in credibility that the jury should not have considered it. The jury was entitled to believe his testimony, which it obviously did. See, generally, Pangle v. Joyce (1996), 76 Ohio St.3d 389,395, 667 N.E.2d 1202 ("Once expert testimony was admitted, it was the jury's role to assess the experts' credibility and to assign weight to the experts' testimony and opinions.").
 {¶ 142} The Ackers defendants additionally challenge DuBois's testimony because he based it upon what they claim to be Brown's false testimony that a wobble occurred. They claim that Brown is a liar and his testimony that a wobble occurred simply cannot be believed. The Ackers defendants thus assert that because DuBois's opinion was based upon a false assumption that a wobble occurred, the jury should have disregarded DuBois's testimony. We disagree.
 {¶ 143} The trial court specifically instructed the jury regarding assumptions underlying expert opinion:
"Questions have been asked in which the expert witness was permitted to assume that certain facts were true and to give an opinion based upon that assumption. You must decide whether the assumed facts on which the experts have based their opinions are true. If any assumed fact was not established by the greater weight of the evidence, you will decide the effect of that failure on the value of the * * * opinions of the expert."
 {¶ 144} We believe that the record contains sufficient evidence for the jury to have concluded that a wobble occurred. Although the Ackers defendants claim that Brown's testimony that a wobble occurred is not credible, we note that at trial in front of the jury, they fully questioned Brown regarding his testimony that a wobble occurred, pointed out that he had told the trooper investigating the accident that he had hit an animal, and then later requested to change his story. They also fully questioned all experts as to whether a wobble would leave physical evidence on the roadway. While some stated it would, others stated that it would be possible that a wobble would not leave physical evidence. Thus, because evidence supports the assumption underlying DuBois's opinion, the jury was entitled to credit his testimony if it saw fit to do so.
 {¶ 145} The Ackers defendants further refer to their experts' testimony that the defective tire did not cause the accident. They basically claim that because more witnesses testified that the defective tire did not cause the accident than witnesses who did, the jury should have believed the former. Sheer number of witnesses testifying to a fact, however, is not the test of whether that fact is true. Rather, when the parties present conflicting evidence on a fact or issue, the ultimate decision as to which version is more credible rests with the jury. In the case at bar, the jury, despite hearing all of the defense witnesses opine that the defective tire did not proximately cause the accident, chose to believe Wright's expert who stated that it did. No manifest injustice occurred.
 {¶ 146} Because DuBois's testimony provided the jury with credible evidence that the defective tire rim proximately caused the accident, the Ackers defendants' argument that the jury verdict finding liability is against the manifest weight of the evidence is without merit.
 {¶ 147} The Ackers defendants further assert that the jury's punitive damage award is against the manifest weight of the evidence. Substantial competent and credible evidence supports the jury's finding that the Ackers defendants acted with malice. They knew that (1) the motorcycle had a defective tire rim; (2) a tire that leaks air poses a risk to a person's safety; and (3) operating a motorcycle with low air pressure could result in substantial injury. Wiseman admitted that he thought the motorcycle with its defective tire rim was dangerous. Given these facts and the facts we outlined when ruling on the Ackers defendants' directed verdict motions, the jury was entitled to find that Wright was entitled to punitive damages.
 {¶ 148} We note that the parties in the case sub judice presented conflicting evidence on nearly every point in issue. The Ackers defendants main claim is that the jury should have found their evidence more persuasive. However, the persuasiveness of the evidence generally should be left for the jury to decide. It rests upon witness credibility, which this court is ill-equipped to determine. While the Ackers defendants may have provided a greater quantity of expert testimony, in the end the jury found Wright's experts more persuasive. Nothing in the record leads us to believe that the jury committed a manifest injustice by doing so.
 {¶ 149} Consequently, we conclude that the trial court did not abuse its discretion by refusing to grant the Ackers defendants a new trial under Civ.R. 59(A)(6).
 e. Under the Catch-All Provision, the Ackers Defendants Are Not Entitled to a New Trial {¶ 150} The Ackers defendants also argue that the totality of the circumstances warrant a new trial. We do not agree.
 {¶ 151} A trial court may grant a new trial "in the sound discretion of the court for good cause shown." Civ.R. 59(A)(9). Koch v. Rist
(2000), 89 Ohio St.3d 250, 251, 730 N.E.2d 963. Thus, the trial court's decision under such circumstances is to be afforded great deference, and a reviewing court will not reverse its decision absent an abuse of discretion. Id.
 {¶ 152} Both parties presented ample evidence in support of their respective cases. The trial court conducted the trial in a professional and appropriate manner and no errors occurred that would impugn the public's confidence or trust in the judicial system. The jury considered the conflicting evidence and found Wright's version more persuasive. Nothing about the case cries out for a new trial or shows that a manifest injustice occurred. Thus, we conclude that the trial court did not abuse its discretion by denying the Ackers defendants request for a new trial under Civ.R. 59(A)(9)'s catch-all provision.
 {¶ 153} Accordingly, based upon the foregoing reasons, we overrule appellant's fifth assignment of error.
 D {¶ 154} In their sixth assignment of error, the Ackers defendants argue that because punitive damages should not have been awarded, attorney fees were not proper.
 {¶ 155} A trial court may award attorney fees to a plaintiff who prevails on a claim for punitive damages. See Galmish v. Cicchini (2000),90 Ohio St.3d 22, 35, 734 N.E.2d 782; Apel v. Katz (1998),83 Ohio St.3d 11, 14, 697 N.E.2d 600. "In other words, "`[a]ttorney fees may be awarded as an element of compensatory damages where the jury finds that punitive damages are warranted.'" Galmish, 90 Ohio St.3d at 35
(quoting Zoppo v. Homestead Ins. Co. (1994), 71 Ohio St.3d 552, 558,644 N.E.2d 397, 402).
 {¶ 156} We have already determined that sufficient evidence supports the jury's decision to award punitive damages and we will not belabor that point. Because punitive damages were proper, the attorney fee award is proper.
 {¶ 157} Accordingly, based upon the foregoing reasons, we overrule the Ackers defendants' sixth assignment of error.
 E {¶ 158} In their seventh assignment of error, the Ackers defendants argue that the court erred by striking Paul Ackers' affidavit. They assert that it "was not designed to impeach the jury verdict, but rather to correct an error in the transmission of the verdict."
 {¶ 159} As with all other matters involving the admission of evidence, we review the court's decision to strike the affidavit for an abuse of discretion. See Cleveland Clinic Foundation v. Commerce GroupBenefits, Inc., Cuyahoga App. No. 79907, 2002-Ohio-1414.
 {¶ 160} Generally, a party may not use a juror's affidavit to impeach a verdict. See State v. Robb (2000), 88 Ohio St.3d 59, 79, 723 N.E.2d 1019,1043; Evid.R. 606. Evid.R. 606 provides:
Upon an inquiry into the validity of a verdict * * *, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. * * * His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes.
 {¶ 161} Thus, Evid.R. 606(B) prohibits both a juror's statements and hearsay testimony concerning the juror's statements provided in an affidavit unless evidence aliunde exists; that is, evidence that is extraneous and independent, based upon the firsthand knowledge of one who is not a juror. See State v. Hessler (2000), 90 Ohio St.3d 108, 123,734 N.E.2d 1237; State v. Schiebel (1990), 55 Ohio St.3d 71, 75,564 N.E.2d 54; State v. Herring, Mahoning App. No. 03MA12, 2004-Ohio-5357. "[T]he information [alleging misconduct] must be from a source which possesses firsthand knowledge of the improper conduct." Schiebel,55 Ohio St.3d at 75; see, also, Hessler, 90 Ohio St.3d at 123. The rule is vital not only to protect jurors from harassment by defeated parties, but to ensure finality of verdicts and preserve the "`sanctity of the jury room and the deliberations therein.'" Wittman v. Akron, Summit App. No. 21375, 2003-Ohio-5617 (quoting State v. Hessler (2000),90 Ohio St.3d 108, 123, 734 N.E.2d 1237).
 {¶ 162} In the case at bar, the Ackers defendants sought to use Paul Ackers' affidavit to impeach the jury's verdict. In his affidavit, Mr. Ackers relied upon the statements that one juror allegedly made to him during a post-trial telephone conversation. This is not proper aliunde evidence sufficient to call the jury's verdict into question. Therefore, the trial court did not abuse its discretion by striking the affidavit.
 {¶ 163} Accordingly, based upon the foregoing reasons, we overrule the Ackers defendants' seventh assignment of error.
 III CASE NO. 03CA3 CRYSTAL WRIGHT'S APPEAL A {¶ 164} In her first assignment of error, Wright asserts that the trial court erred by directing a verdict upon her opening statement in Mrs. Ackers' and Coleman's favor regarding her punitive damage claim. Wright contends that the complaint and her opening statement presented sufficient evidence to allow reasonable minds to differ as to whether Mrs. Ackers and Coleman exhibited a conscious disregard for the rights and safety of others that carried a great probability of harm. Wright argues that "there is no question that the complaint specifically set forth a claim for punitive damages." Wright refers to paragraph 49 of her Second Amended Complaint, which states:
"The action and activities of Defendants Suzuki Motor Corporation, American Suzuki Motor Corporation, Ask Powersports, Ackers, Inc., Mary Josephine Ackers, Todd Coleman, and Steven E. Wiseman constitute gross negligence and/or willful and/or wanton misconduct entitling Plaintiff Crystal L. Wright to a recovery of punitive damages."
 {¶ 165} Wright also refers to the following factual allegations of her complaint: (1) the Ackers defendants knew that the front tire and wheel were defective and that the front tire would lose air pressure; (2) in spite of their knowledge, the Ackers defendants delivered the motorcycle to Brown and assured him that it was safe when in fact it was a defective and unreasonably dangerous product; (3) the Ackers defendants knew that Brown intended to ride the motorcycle and use it until the defective part was replaced.
 {¶ 166} Wright further asserts that she alleged sufficient facts in her opening statement to support her punitive damages claim against Mrs. Ackers and Coleman. She refers to the following statements: (1) Coleman assured Brown that the motorcycle would be available for delivery on August 10, 2002; (2) when Brown arrived to take delivery of the motorcycle, he was advised that it had a small leak but that the motorcycle was safe to ride; (3) Wiseman "went through the roof" when he learned that the motorcycle had been sold and advised both Coleman and Ackers that the motorcycle should not leave the dealership.
 {¶ 167} Wright additionally refers to the following statements counsel made during opening statement:
"What you're going to find out, however, is that Mr. Wiseman, who was head of that department, when he found out that motorcycle had been sold, he went through the roof.
He went to the salesman, he went to his boss, Mary Jo Ackers, and said, this motorcycle should not leave the property. It's not safe.
The instructions he got, Mr. Wiseman got from his boss was, go see if you can talk Mr. Brown into leaving it. But, in essence, don't mess up the deal. And Mr. Wiseman was put in the middle.
He had a motorcycle that he considered unsafe and dangerous. He had a boss who didn't want to have a sale fall through. He was not as candid with Mr. Brown as he had been with his boss, as he had been with the salesman.
He did not tell Mr. Brown the same things. He didn't tell him, `It's dangerous.' He didn't tell him, `It is unsafe.' He didn't tell him, `I red-tagged that motorcycle.' They sent him out the door.
And you know what else they did, they gave him, as part of the deal, a helmet for his girlfriend.
They sent him out the door with a motorcycle that they knew was dangerous, and their salesman helped strap this helmet on the back of the motorcycle."
 {¶ 168} Wright asserts that if the above facts are true, they support a finding that Coleman and Mrs. Ackers acted with a conscious disregard for Wright's rights that had a great probability of harm.
 {¶ 169} The Ackers defendants argue that the court did not err by directing a verdict in Mrs. Ackers' and Coleman's favor. They argue that Wright did not produce any evidence: (1) that Mrs. Ackers or Coleman acted with conscious wrongdoing; and (2) that anyone at the dealership knew that she would be riding the motorcycle before the defect was fixed. The Ackers defendants further contend that Wright failed to mention in her opening statement or complaint that Mrs. Ackers or Coleman engaged in conduct carrying a great probability of substantial harm or that she would prove such facts by clear and convincing evidence.
 {¶ 170} As we previously noted, a court should exercise great caution in sustaining a motion for a directed verdict made following an opening statement. Job v. Cleveland Dance Ctr. (1989), 62 Ohio App.3d 678, 684,577 N.E.2d 396. A directed verdict is proper after opening statements if, construing the statement in favor of the party against whom the motion is made, it is clear that all the facts expected to be proved, and those which have been stated, do not constitute a cause of action or defense. Id.; Brinkmoeller v. Wilson (1975), 41 Ohio St.2d 223,325 N.E.2d 233; see Civ.R. 50(A)(4). The court must consider the facts alleged in the opening statement and the complaint. Mitchell v. ClevelandElec. Illum. Co. (1987), 30 Ohio St.3d 92, 507 N.E.2d 352; Sapp v. StoneyRidge Truck Tire (1993), 86 Ohio App.3d 85, 93, 619 N.E.2d 1172. In ruling on a motion for a directed verdict upon opening statements, the court must construe the facts in the opening statement and the complaint in a light most favorable to the nonmovant. Mitchell; Sapp,86 Ohio App.3d at 93. A trial court does not err by granting a defendant's motion for directed verdict, made at the close of plaintiff's opening statement, "if, engaging in every reasonable inference from facts favorable to the party against whom the motion is directed, the proposed proof would not sustain a claim upon which relief could be granted."Phillips v. Borg-Warner Corp. (1972), 32 Ohio St.2d 266, 268,291 N.E.2d 736; see, also, U.S. Aviation Underwriters, Inc. v. B.F.Goodrich Co. (2002), 149 Ohio App.3d 569, 574, 778 N.E.2d 122.
 {¶ 171} In the case at bar, we believe that Wright alleged in her complaint and opening statement sufficient facts to allow reasonable minds to reach differing conclusions regarding her punitive damages claim. The question is whether she alleged sufficient facts as to Mrs. Ackers and Coleman to warrant a punitive damage award against them.
 {¶ 172} Because punitive damages are assessed for punishment and not compensation, a positive element of conscious wrongdoing is always required. Preston v. Murty (1987), 32 Ohio St.3d 334, 335, 512 N.E.2d 1174. "This element has been termed conscious, deliberate or intentional. It requires the party to possess knowledge of the harm that might be caused by his behavior." Id.
 {¶ 173} Moreover, "something more than mere negligence is always required." Id. "This concept is reflected in the use of such terms as `outrageous,' `flagrant,' and `criminal.' The concept requires a finding that the probability of harm occurring is great and that the harm will be substantial. A possibility or even probability is not enough as that requirement would place the act in the realm of negligence." Id. at 335-36.
 {¶ 174} Thus, the Ohio Supreme Court has defined actual malice, necessary for an award of punitive damages, as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." Id. at 336. Additionally, sufficient evidence must exist that the defendant consciously disregarded the plaintiff's rights or safety. Id.
 {¶ 175} In the case sub judice, we conclude that the trial court did not err by determining that Wright's complaint and opening statement failed to allege sufficient facts to allow reasonable minds to reach differing conclusions as to whether Mrs. Ackers or Coleman acted with actual malice. Neither her complaint nor her opening statement contain sufficient factual allegations to support a finding that Mrs. Ackers or Coleman knew that allowing Brown to take the motorcycle carried a great probability of causing substantial harm. Instead, the evidence she alleged shows that Mrs. Ackers and Coleman were passive intermediaries who did not fully appreciate the dangerous condition of the motorcycle. None of the facts in Wright's opening statement or complaint alleged active conduct on Mrs. Ackers or Coleman's part to support a punitive damage claim against them. Wright's allegations show that Wiseman and the Ackers dealership knew of the dangerous condition of the motorcycle, but not that Mrs. Ackers, individually, or Coleman, individually, were fully aware of the danger that could result by allowing Brown to take the motorcycle with the defective wheel. Therefore, the trial court did not err by directing a verdict in their favor following Wright's opening statement.
 {¶ 176} Accordingly, based upon the foregoing reasons, we overrule Wright's first assignment of error.
 B {¶ 177} In her second assignment of error, Wright asserts that the trial court erred by denying her prejudgment interest motion. She contends that the Ackers defendants did not: (1) make a good faith effort to settle the case; (2) rationally evaluate its risks and potential liability; and (3) make a good faith monetary settlement and respond in good faith to her settlement offer. She alleges:
"* * * [T]he parties engaged in a mediation on January 11, 2002. At that time, the [Ackers defendants] made a combined offer with the Suzuki Defendants of $150,000 as a full and complete settlement in this action conditioned on a release of both the Ackers Defendants and Suzuki Defendants in response to Plaintiff's demand for $7,500,000 as to the Ackers Defendants and $6,000,000 as to the Suzuki Defendants. This offer was comprised of a $50,000 contribution from the Suzuki Defendants, making the offer from the Ackers Defendants in the amount of $100,000.
Prior to trial, Plaintiffs reduced their demand as against the Ackers Defendants to a demand of the policy limit available to these Defendants, that being $3,500,000, and in the alternative, proposed a high/low settlement capping the liability of the Ackers Defendants including any obligations of contribution or indemnity owed to the Suzuki Defendants at $3,500,000 and a low figure of $1,500,000 by its letter dated February 6, 2002. Counsel for Plaintiffs was advised that the high/low agreement was objected to the by the [sic] Suzuki Defendants, but regardless the low figure of $1,500,000 was not acceptable. Thereafter, prior to submission of the case to the Jury and before the verdict was returned, Plaintiffs-Appellants submitted a written proposal setting forth the high/low terms and leaving the low figure to be proposed by the Ackers Defendants.
In response to such proposals, the Ackers Defendants did not increase at any time their settlement offer of $100,000, and did not respond to the high/low proposal. * * * [T]he jury awarded compensatory damages against all Defendants in the amount of $5,278,703.00 and punitive damages of $1,000,000 as against Ackers, Inc. and Stephen E. Wiseman."
 {¶ 178} Wright further notes that former Ohio Supreme Court Justice Craig Wright stated that based upon his review of the case, the defense had not properly evaluated the case for settlement purposes and that he believed that prejudgment interest was appropriate.
 {¶ 179} The Ackers defendants argue, however, that the trial court did not abuse its discretion by denying Wright prejudgment interest. They contend that before trial began, they reasonably believed that Wright's expert, DuBois, would be unable to testify as to a reasonable degree of certainty that the low tire pressure caused the accident, and that without such testimony, Wright would not prevail at a trial. They further argue that the trial court properly discounted Justice Wright's testimony.
 {¶ 180} R.C. 1343.03(C) governs the award of prejudgment interest in the tort context and states:
"Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."
 {¶ 181} The statute was enacted to promote settlement efforts, to prevent parties who engage in tortious conduct from frivolously delaying the ultimate resolution of cases, and to encourage good faith efforts to settle controversies outside a trial setting. See Kalain v. Smith
(1986), 25 Ohio St.3d 157, 159, 495 N.E.2d 572. A party has not "failed to make a good faith effort to settle" under R.C. 1343.03(C) if it has (1) fully cooperated in discovery proceedings, (2) rationally evaluated its risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. Evans v. Dayton Power and Light Co., supra, at ¶ 65. If a party has a good faith, objectively reasonable belief that it has no liability, it need not make a monetary settlement offer. Kalain, at syllabus. A party may have "failed to make a good faith effort to settle" even when it has not acted in bad faith. Id. at 159, citing Mills v.Dayton (1985), 21 Ohio App.3d 208, 486 N.E.2d 1209. The party seeking prejudgment interest bears the burden of proof. Moskovitz v. Mt. SinaiMed. Ctr. (1994), 69 Ohio St.3d 638, 658, 635 N.E.2d 331.
 {¶ 182} The decision to award prejudgment interest rests within the trial court's sound discretion. Scioto Mem. Hosp. Assn., Inc. v. PriceWaterhouse (1996), 74 Ohio St.3d 474, 479, 659 N.E.2d 1268. Thus, absent an abuse of discretion, a reviewing court will not reverse a trial court's prejudgment interest decision. Kalain, 25 Ohio St.3d at 159; see, also, Evans. "In order to have an `abuse' in reaching a determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." Huffman v. HairSurgeon, Inc. (1985), 19 Ohio St.3d 83, 87, 482 N.E.2d 1248; see, also,Wagner v. Marietta Area Health Care, Inc. (Mar. 16, 2001), Washington App. No. 00CA17.
 {¶ 183} In the case at bar, we conclude that the trial court did not abuse its discretion by denying Wright's prejudgment interest motion. Applying the four factors outlined above, the record shows that: (1) the Ackers defendants fully cooperated in discovery proceedings; (2) they rationally evaluated their risks and potential liability; (3) they did not attempt to unnecessarily delay any of the proceedings; and (4) they made a good faith effort to settle. Nothing suggests, and Wright has not argued, that the Ackers defendants did not fully cooperate in the discovery proceedings. The trial court reasonably could have determined that the Ackers defendants rationally evaluated the risks and potential liability. Until trial, the Ackers defendants did not believe that Wright would be able to establish a critical element of her case (proximate cause) and, thus, they could have determined that their potential liability would be zero. Also, nothing in the record suggests, and Wright has not argued, that the Ackers defendants attempted to unnecessarily delay any of the proceedings. Finally, the trial court reasonably could have determined that the Ackers defendants made a good faith settlement offer. As we noted, supra, the Ackers defendants rationally could have determined, based upon the lack of proximate cause testimony expressed to a reasonable degree of scientific certainty, that Wright would not be able to establish an element of her case, thus leading to a defense verdict. In Kalain, the court stated that "[i]f a party has a good faith, objectively reasonable belief that it has no liability, it need not make a monetary settlement offer." Because the Ackers defendants possessed such a belief, they were not required, although they did, to make a monetary settlement offer. Based upon our analysis of the four factors, therefore, we conclude that the trial court did not abuse its discretion by denying Wright's prejudgment interest motion.
 {¶ 184} Accordingly, based upon the foregoing reasons, we overrule Wright's second assignment of error.
 IV CASE NO. 03CA4 LARRY WRIGHT'S APPEAL A {¶ 185} In his first assignment of error, Larry Wright argues that the trial court erred by entering judgment upon the minor children's claims, but not awarding any monetary damages. He contends that the jury's decision not to award any monetary damages is against the manifest weight of the evidence.
 {¶ 186} The assessment of damages is generally a matter left to the jury's discretion. Weidner v. Blazic (1994), 98 Ohio App.3d 321, 334,648 N.E.2d 565. A court may not award a new trial on the basis of inadequate damages unless the movant is able to establish that the verdict resulted from jury passion and prejudice and that the damages were "so overwhelmingly disproportionate as to shock reasonable sensibilities." Pena, 108 Ohio App.3d at 104. A court may find a jury award inadequate if it fails to award damages despite uncontroverted evidence. See Dillon v. Bundy (1992), 72 Ohio App.3d 767, 773,596 N.E.2d 500. An appellate court ultimately reviews a jury's damage calculation to see whether it is against the manifest weight of the evidence. See Baker v. Dorion, 155 Ohio App.3d 560, 2003-Ohio-6834,802 N.E.2d 176, at ¶ 10.
 {¶ 187} In the case at bar, we believe that the jury's decision to award no damages for the minor children's loss of consortium claim is not against the manifest weight of the evidence. The evidence revealed that Crystal Wright continues to share a loving relationship with her children. Although she can no longer engage in some of the activities with them that she did before the accident, we do not believe that the jury's decision to award zero damages was against the manifest weight of the evidence. The jury could have conceivably decided that although Crystal and her children can no longer engage in some of the activities they once enjoyed, that the children have not suffered a quantifiable loss. The jury also could have decided that despite being confined to a wheelchair, Crystal and the children can still share an active relationship and that Crystal is capable of caring for the children. The jury may have not fully believed the testimony that Crystal's disability sufficiently interferes with the relationship she shares with her children.
 {¶ 188} Accordingly, based upon the foregoing reasons, we overrule Wright's first assignment of error.
 B {¶ 189} In his second assignment of error, Wright asserts that the trial court erred by entering judgment in his favor regarding the punitive damage claim but awarding zero damages.
 {¶ 190} "`[T]he jury is given wide discretion in determining whether punitive damages are justified and in assessing the amount of such damages based upon its collective judgment as to the punitive and deterrent effect that such an award would have.'" See Waddell v. RoxaneLaboratories, Inc., Franklin App. No. 03AP-558, 2004-Ohio-2499, at ¶ 44, quoting Toole v. Cook (May 6, 1999), Franklin App. No. 98AP-486.
 {¶ 191} Thus, because the decision to award punitive damages is committed to the jury, we will not second-guess its decision. The jury reasonably could have determined that the minor children were not entitled to punitive damages.
 {¶ 192} Accordingly, based upon the foregoing reasons, we overrule Wright's second assignment of error.
 C {¶ 193} In his third assignment of error, Larry Wright asserts that the trial court erred by directing a verdict in Mrs. Ackers and Coleman's favor regarding the punitive damages claim.
 {¶ 194} We addressed this argument in Crystal Wright's first assignment of error and determined that the trial court did not err. For those same reasons, we overrule Larry Wright's third assignment of error.
 V CONCLUSION {¶ 195} Accordingly, having overruled all of the parties' assignments of error, we hereby affirm the trial court's judgment.
Judgment Affirmed.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that the parties equally share the costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Meigs County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Abele, P.J., Kline, J. Grey, J.: Concur in Judgment Opinion
[3] At times, the parties refer to Ackers, Inc. and ASK Powersports as separate entities. We refer to them as reflected on the jury's verdict forms, Ackers, Inc. dba ASK Powersports.
[4] Wiseman died during the proceedings and his estate initially appealed the trial court's judgment, but subsequently dismissed the appeal. Thus, the reference to the Ackers defendants, for purposes of appeal, excludes Wiseman.
[5] Wright asserts in her statement of facts and throughout her argument that Wiseman red-flagged the motorcycle. We, however, find the testimony on this issue to be less than clear. In any event, the facts indicate that some kind of notation was made that the rim needed to be replaced.
[6] In DuBois's deposition, he stated that low tire pressure can cause instability, but he could not state whether Brown's motorcycle tire pressure was low enough to cause instability problems. He believes that the tire pressure was 18 psi at the time of the accident but does not know with certainty whether that could have cause steering instability. DuBois admitted that he could not state with scientific certainty that the tire pressure was low enough to cause a problem of steering instability that resulted in the accident. "Not with a reasonable degree of scientific certainty, only that I'm prepared to express an opinion that what information I have is consistent with the conclusion.
He was questioned regarding Brown's testimony that a wobble occurred. He explained that he did not disbelieve Brown's testimony, but he did not see any physical evidence that a wobble occurred.
[7] Brown had asserted negligence claims against the Ackers defendants.
[8] We have been unable to locate anything in the record to substantiate Wright's claim.
[9] Initially, we note that the Ackers defendants did not separately argue each assignment of error, and the sections of their argument do not always correspond to the seven assignments of error. App.R. 12(A)(2) authorizes us to disregard any assignment of error that a party fails to argue separately. While their failure to separately argue each assignment of error has made our job in reviewing their appeal more difficult than it need be, we nonetheless have considered all of the assignments of error and the arguments presented.
[10] As previously noted, the trial court granted the motion as to Mrs. Ackers and Coleman, but denied it as to Ackers, Inc. dba ASK Powersports and Wiseman. Because Wiseman's estate dismissed the appeal, this assignment of error does not concern him.
[11] Civ.R. 26(E) provides:
Supplementation of responses. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
A party is under a duty seasonably to supplement his response with respect to any question directly addressed to * * *
(b) the identity of each person expected to be called as an expert witness at trial and the subject matter on which he is expected to testify.
[12] Technically, the Ackers defendants assert that the trial court erred by not directing a verdict in Ackers, Inc. dba ASK Powersports and Wiseman's favor. The court granted the motion with respect to Mrs. Ackers and Coleman, and Wiseman dismissed his appeal. For ease of discussion, we nonetheless refer to the parties who remained after the court granted the directed verdict motion at the close of Wright's opening statement as the Ackers defendants. When appropriate, we refer to the individual parties.
[13] In their seventh assignment of error, the Ackers defendants assert that the trial court abused its discretion by striking the affidavit evidence. As we explain in that assignment of error, however, the trial court did not abuse its discretion. Thus, it is not proper evidence for us to consider.